(Slip Opinion)        OCTOBER TERM, 2010        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BULLCOMING *v.* NEW MEXICO

### CERTIORARI TO THE SUPREME COURT OF NEW MEXICO

No. 09–10876.   Argued March 2, 2011—Decided June 23, 2011

The Sixth Amendment's Confrontation Clause gives the accused "[i]n
all criminal prosecutions, . . . the right . . . to be confronted with the
witnesses against him."  In *Crawford* v. *Washington*, 541 U. S. 36, 59,
this Court held that the Clause permits admission of "[t]estimonial
statements of witnesses absent from trial . . . only where the decla-
rant is unavailable, and only where the defendant has had a prior
opportunity to cross-examine."  Later, in *Melendez-Diaz* v. *Massachu-
setts*, 557 U. S. ___, the Court declined to create a "forensic evidence"
exception to *Crawford*, holding that a forensic laboratory report, cre-
ated specifically to serve as evidence in a criminal proceeding, ranked
as "testimonial" for Confrontation Clause purposes.  Absent stipula-
tion, the Court ruled, the prosecution may not introduce such a re-
port without offering a live witness competent to testify to the truth
of the report's statements.  557 U. S., at ___.

   Petitioner Bullcoming's jury trial on charges of driving while in-
toxicated (DWI) occurred after *Crawford,* but before *Melendez-Diaz.*
Principal evidence against him was a forensic laboratory report certi-
fying that his blood-alcohol concentration was well above the thresh-
old for aggravated DWI.  Bullcoming's blood sample had been tested
at the New Mexico Department of Health, Scientific Laboratory Divi-
sion (SLD), by a forensic analyst named Caylor, who completed,
signed, and certified the report.  However, the prosecution neither
called Caylor to testify nor asserted he was unavailable; the record
showed only that Caylor was placed on unpaid leave for an undis-
closed reason.  In lieu of Caylor, the State called another analyst,
Razatos, to validate the report.  Razatos was familiar with the testing
device used to analyze Bullcoming's blood and with the laboratory's
testing procedures, but had neither participated in nor observed the
test on Bullcoming's blood sample.  Bullcoming's counsel objected, as-

serting that introduction of Caylor's report without his testimony
would violate the Confrontation Clause, but the trial court overruled
the objection, admitted the SLD report as a business record, and
permitted Razatos to testify. Bullcoming was convicted, and, while
his appeal was pending before the New Mexico Supreme Court, this
Court decided *Melendez-Diaz.* The state high court acknowledged
that the SLD report qualified as testimonial evidence under
*Melendez-Diaz*, but held that the report's admission did not violate
the Confrontation Clause because: (1) certifying analyst Caylor was a
mere scrivener who simply transcribed machine-generated test re-
sults, and (2) SLD analyst Razatos, although he did not participate in
testing Bullcoming's blood, qualified as an expert witness with re-
spect to the testing machine and SLD procedures. The court affirmed
Bullcoming's conviction.

*Held:* The judgment is reversed, and the case is remanded.

147 N. M. 487, 226 P. 3d 1, reversed and remanded.

    JUSTICE GINSBURG delivered the opinion of the Court with respect
to all but Part IV and footnote 6. The Confrontation Clause, the opin-
ion concludes, does not permit the prosecution to introduce a forensic
laboratory report containing a testimonial certification, made in or-
der to prove a fact at a criminal trial, through the in-court testimony
of an analyst who did not sign the certification or personally perform
or observe the performance of the test reported in the certification.
The accused's right is to be confronted with the analyst who made the
certification, unless that analyst is unavailable at trial, and the ac-
cused had an opportunity, pretrial, to cross-examine that particular
scientist. Pp. 8–16.

    (a) If an out-of-court statement is testimonial, it may not be intro-
duced against the accused at trial unless the witness who made the
statement is unavailable and the accused has had a prior opportunity
to confront that witness. Pp. 8–14.

      (i) Caylor's certification reported more than a machine-generated
number: It represented that he received Bullcoming's blood sample
intact with the seal unbroken; that he checked to make sure that the
forensic report number and the sample number corresponded; that he
performed a particular test on Bullcoming's sample, adhering to a
precise protocol; and that he left the report's remarks section blank,
indicating that no circumstance or condition affected the sample's in-
tegrity or the analysis' validity. These representations, relating to
past events and human actions not revealed in raw, machine-
produced data, are meet for cross-examination. The potential ramifi-
cations of the state court's reasoning, therefore, raise red flags. Most
witnesses testify to their observations of factual conditions or events.
Where, for example, a police officer's report recorded an objective fact

such as the read-out of a radar gun, the state court's reasoning would permit another officer to introduce the information, so long as he or she was equipped to testify about the technology the observing officer deployed and the police department's standard operating procedures. As, *e.g., Davis* v. *Washington*, 547 U. S. 813, 826, makes plain, however, such testimony would violate the Confrontation Clause. The comparative reliability of an analyst's testimonial report does not dispense with the Clause. *Crawford,* 541 U. S., at 62. The analysts who write reports introduced as evidence must be made available for confrontation even if they have "the scientific acumen of Mme. Curie and the veracity of Mother Teresa." *Melendez-Diaz*, 557 U. S., at \_\_\_, n. 6. Pp. 10–11.

(ii) Nor was Razatos an adequate substitute witness simply because he qualified as an expert with respect to the testing machine and the SLD's laboratory procedures. Surrogate testimony of the kind Razatos was equipped to give could not convey what Caylor knew or observed about the events he certified, nor expose any lapses or lies on Caylor's part. Significantly, Razatos did not know why Caylor had been placed on unpaid leave. With Caylor on the stand, Bullcoming's counsel could have asked Caylor questions designed to reveal whether Caylor's incompetence, evasiveness, or dishonesty accounted for his removal from work. And the State did not assert that Razatos had any independent opinion concerning Bullcoming's blood alcohol content. More fundamentally, the Confrontation Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination. Although the purpose of Sixth Amendment rights is to ensure a fair trial, it does not follow that such rights can be disregarded because, on the whole, the trial is fair. *United States* v. *Gonzalez-Lopez,* 548 U. S. 140, 145. If a "particular guarantee" is violated, no substitute procedure can cure the violation. *Id.,* at 146. Pp. 11–14.

(b) *Melendez-Diaz* precluded the State's argument that introduction of the SLD report did not implicate the Confrontation Clause because the report is nontestimonial. Like the certificates in *Melendez-Diaz*, the SLD report is undoubtedly an "affirmation made for the purpose of establishing or proving some fact" in a criminal proceeding. 557 U. S., at \_\_\_. Created solely for an "evidentiary purpose," *id.,* at \_\_\_, the report ranks as testimonial. In all material respects, the SLD report resembles the certificates in *Melendez-Diaz.* Here, as there, an officer provided seized evidence to a state laboratory required by law to assist in police investigations. Like the *Melendez-Diaz* analysts, Caylor tested the evidence and prepared a certificate concerning the result of his analysis. And like the *Melendez-Diaz*

Syllabus

certificates, Caylor's report here is "formalized" in a signed document, *Davis*, 547 U. S., at 837, n. 2. Also noteworthy, the SLD report form contains a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses. Thus, although the SLD report was not notarized, the formalities attending the report were more than adequate to qualify Caylor's assertions as testimonial. Pp. 14–16.

GINSBURG, J., delivered the opinion of the Court, except as to Part IV and footnote 6. SCALIA, J., joined that opinion in full, SOTOMAYOR and KAGAN, JJ., joined as to all but Part IV, and THOMAS, J., joined as to all but Part IV and footnote 6. SOTOMAYOR, J., filed an opinion concurring in part. KENNEDY, J., filed a dissenting opinion, in which ROBERTS, C. J., and BREYER and ALITO, JJ., joined.

1

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

––––––––––

## No. 09–10876

––––––––––

## DONALD BULLCOMING, PETITIONER *v.* NEW MEXICO

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NEW MEXICO

[June 23, 2011]

JUSTICE GINSBURG delivered the opinion of the Court, except as to Part IV and footnote 6.*

In *Melendez-Diaz* v. *Massachusetts*, 557 U. S. ___ (2009), this Court held that a forensic laboratory report stating that a suspect substance was cocaine ranked as testimonial for purposes of the Sixth Amendment's Confrontation Clause. The report had been created specifically to serve as evidence in a criminal proceeding. Absent stipulation, the Court ruled, the prosecution may not introduce such a report without offering a live witness competent to testify to the truth of the statements made in the report.

In the case before us, petitioner Donald Bullcoming was arrested on charges of driving while intoxicated (DWI). Principal evidence against Bullcoming was a forensic laboratory report certifying that Bullcoming's blood-alcohol concentration was well above the threshold for aggravated DWI. At trial, the prosecution did not call as a witness the analyst who signed the certification. Instead, the State called another analyst who was familiar with the

––––––––––

*JUSTICE SOTOMAYOR and JUSTICE KAGAN join all but Part IV of this opinion. JUSTICE THOMAS joins all but Part IV and footnote 6.

laboratory's testing procedures, but had neither partici-
pated in nor observed the test on Bullcoming's blood sam-
ple.  The New Mexico Supreme Court determined that,
although the blood-alcohol analysis was "testimonial," the
Confrontation Clause did not require the certifying ana-
lyst's in-court testimony.  Instead, New Mexico's high
court held, live testimony of another analyst satisfied the
constitutional requirements.

The question presented is whether the Confrontation
Clause permits the prosecution to introduce a forensic
laboratory report containing a testimonial certification—
made for the purpose of proving a particular fact—through
the in-court testimony of a scientist who did not sign the
certification or perform or observe the test reported in the
certification.  We hold that surrogate testimony of that
order does not meet the constitutional requirement.  The
accused's right is to be confronted with the analyst who
made the certification, unless that analyst is unavailable
at trial, and the accused had an opportunity, pretrial, to
cross-examine that particular scientist.

## I
### A

In August 2005, a vehicle driven by petitioner Donald
Bullcoming rear-ended a pick-up truck at an intersection
in Farmington, New Mexico.  When the truckdriver exited
his vehicle and approached Bullcoming to exchange insur-
ance information, he noticed that Bullcoming's eyes were
bloodshot.  Smelling alcohol on Bullcoming's breath, the
truckdriver told his wife to call the police.  Bullcoming left
the scene before the police arrived, but was soon appre-
hended by an officer who observed his performance of field
sobriety tests.  Upon failing the tests, Bullcoming was
arrested for driving a vehicle while "under the influence of
intoxicating liquor" (DWI), in violation of N. M. Stat. Ann.
§66–8–102 (2004).

Because Bullcoming refused to take a breath test, the police obtained a warrant authorizing a blood-alcohol analysis. Pursuant to the warrant, a sample of Bullcoming's blood was drawn at a local hospital. To determine Bullcoming's blood-alcohol concentration (BAC), the police sent the sample to the New Mexico Department of Health, Scientific Laboratory Division (SLD). In a standard SLD form titled "Report of Blood Alcohol Analysis," participants in the testing were identified, and the forensic analyst certified his finding. App. 62.

SLD's report contained in the top block "information . . . filled in by [the] arresting officer." *Ibid.* (capitalization omitted). This information included the "reason [the] suspect [was] stopped" (the officer checked "Accident"), and the date ("8.14.05") and time ("18:25 PM") the blood sample was drawn. *Ibid.* (capitalization omitted). The arresting officer also affirmed that he had arrested Bullcoming and witnessed the blood draw. *Ibid.* The next two blocks contained certifications by the nurse who drew Bullcoming's blood and the SLD intake employee who received the blood sample sent to the laboratory. *Ibid.*

Following these segments, the report presented the "certificate of analyst," *ibid.* (capitalization omitted), completed and signed by Curtis Caylor, the SLD forensic analyst assigned to test Bullcoming's blood sample. *Id.*, at 62, 64–65. Caylor recorded that the BAC in Bullcoming's sample was 0.21 grams per hundred milliliters, an inordinately high level. *Id.*, at 62. Caylor also affirmed that "[t]he seal of th[e] sample was received intact and broken in the laboratory," that "the statements in [the analyst's block of the report] are correct," and that he had "followed the procedures set out on the reverse of th[e] report." *Ibid.* Those "procedures" instructed analysts, *inter alia*, to "retai[n] the sample container and the raw data from the analysis," and to "not[e] any circumstance or condition which might affect the integrity of the sample or otherwise

affect the validity of the analysis." *Id.*, at 65. Finally, in a block headed "certificate of reviewer," the SLD examiner who reviewed Caylor's analysis certified that Caylor was qualified to conduct the BAC test, and that the "established procedure" for handling and analyzing Bullcoming's sample "ha[d] been followed." *Id.*, at 62 (capitalization omitted).

SLD analysts use gas chromatograph machines to determine BAC levels. Operation of the machines requires specialized knowledge and training. Several steps are involved in the gas chromatograph process, and human error can occur at each step.[1]

––––––––––

[1] Gas chromatography is a widely used scientific method of quantitatively analyzing the constituents of a mixture. See generally H. McNair & J. Miller, Basic Gas Chromatography (2d ed. 2009) (hereinafter McNair). Under SLD's standard testing protocol, the analyst extracts two blood samples and inserts them into vials containing an "internal standard"—a chemical additive. App. 53. See McNair 141–142. The analyst then "cap[s] the [two] sample[s]," "crimp[s] them with an aluminum top," and places the vials into the gas chromatograph machine. App. 53–54. Within a few hours, this device produces a printed graph—a chromatogram—along with calculations representing a software-generated interpretation of the data. See Brief for State of New Mexico Dept. of Health, SLD as *Amicus Curiae* 16–17.

Although the State presented testimony that obtaining an accurate BAC measurement merely entails "look[ing] at the [gas chromatograph] machine and record[ing] the results," App. 54, authoritative sources reveal that the matter is not so simple or certain. "In order to perform quantitative analyses satisfactorily and . . . support the results under rigorous examination in court, the analyst must be aware of, and adhere to, good analytical practices and understand what is being done and why." Stafford, Chromatography, in Principles of Forensic Toxicology 92, 114 (B. Levine 2d ed. 2006). See also McNair 137 ("Errors that occur in any step can invalidate the best chromatographic analysis, so attention must be paid to all steps."); D. Bartell, M. McMurray, & A. ImObersteg, Attacking and Defending Drunk Driving Tests §16:80 (2d revision 2010) (stating that 93% of errors in laboratory tests for BAC levels are human errors that occur either before or after machines analyze samples). Even after the machine has produced its printed result, a review of the chromatogram may indicate that the test was not

Caylor's report that Bullcoming's BAC was 0.21 supported a prosecution for aggravated DWI, the threshold for which is a BAC of 0.16 grams per hundred milliliters, §66–8–102(D)(1).  The State accordingly charged Bullcoming with this more serious crime.

## B

The case was tried to a jury in November 2005, after our decision in *Crawford* v. *Washington*, 541 U. S. 36 (2004), but before *Melendez-Diaz*.  On the day of trial, the State announced that it would not be calling SLD analyst Curtis Caylor as a witness because he had "very recently [been] put on unpaid leave" for a reason not revealed.  2010–NMSC–007, ¶8, 226 P. 3d 1, 6 (internal quotation marks omitted); App. 58.  A startled defense counsel objected.  The prosecution, she complained, had never disclosed, until trial commenced, that the witness "out there . . . [was] not the analyst [of Bullcoming's sample]."  *Id.,* at 46.  Counsel stated that, "had [she] known that the analyst [who tested Bullcoming's blood] was not available," her opening, indeed, her entire defense "may very well have been dramatically different."  *Id.*, at 47.  The State, however, proposed to introduce Caylor's finding as a "business

_____

valid.  See McNair 207–214.

Nor is the risk of human error so remote as to be negligible.  *Amici* inform us, for example, that in neighboring Colorado, a single forensic laboratory produced at least 206 flawed blood-alcohol readings over a three-year span, prompting the dismissal of several criminal prosecutions.  See Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 32–33.  An analyst had used improper amounts of the internal standard, causing the chromatograph machine systematically to inflate BAC measurements.  The analyst's error, a supervisor said, was "fairly complex."  Ensslin, Final Tally on Flawed DUI: 206 Errors, 9 Tossed or Reduced, Colorado Springs Gazette, Apr. 19, 2010, p. 1 (internal quotation marks omitted), available at http://www.gazette.com/articles/report-97354-police-discuss.html.  (All Internet materials as visited June 21, 2011, and included in Clerk of Court's case file).

record" during the testimony of Gerasimos Razatos, an SLD scientist who had neither observed nor reviewed Caylor's analysis. *Id.*, at 44.

Bullcoming's counsel opposed the State's proposal. *Id.*, at 44–45. Without Caylor's testimony, defense counsel maintained, introduction of the analyst's finding would violate Bullcoming's Sixth Amendment right "to be confronted with the witnesses against him." *Ibid.*[2] The trial court overruled the objection, *id.*, at 46–47, and admitted the SLD report as a business record, *id.*, at 44–46, 57.[3] The jury convicted Bullcoming of aggravated DWI, and the New Mexico Court of Appeals upheld the conviction, concluding that "the blood alcohol report in the present case was non-testimonial and prepared routinely with guarantees of trustworthiness." 2008–NMCA–097, §17, 189 P. 3d 679, 685.

## C

While Bullcoming's appeal was pending before the New Mexico Supreme Court, this Court decided *Melendez-Diaz*. In that case, "[t]he Massachusetts courts [had] admitted into evidence affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." 557 U. S., at ___ (slip op., at 1). Those affidavits, the Court held, were "'testimonial,' rendering the affiants 'witnesses' subject to

---

[2] The State called as witnesses the arresting officer and the nurse who drew Bullcoming's blood. Bullcoming did not object to the State's failure to call the SLD intake employee or the reviewing analyst. "It is up to the prosecution," the Court observed in *Melendez-Diaz* v. *Massachusetts*, 557 U. S. ___, ___, n. 1 (2009) (slip op., at 5, n. 1), "to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live."

[3] The trial judge noted that, when he started out in law practice, "there were no breath tests or blood tests. They just brought in the cop, and the cop said, 'Yeah, he was drunk.'" App. 47.

the defendant's right of confrontation under the Sixth Amendment." *Ibid.*

In light of *Melendez-Diaz*, the New Mexico Supreme Court acknowledged that the blood-alcohol report introduced at Bullcoming's trial qualified as testimonial evidence. Like the affidavits in *Melendez-Diaz*, the court observed, the report was "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." 226 P. 3d, at 8 (quoting *Melendez-Diaz*, 557 U. S., at ___ (slip op., at 4)).[4] Nevertheless, for two reasons, the court held that admission of the report did not violate the Confrontation Clause.

First, the court said certifying analyst Caylor "was a mere scrivener," who "simply transcribed the results generated by the gas chromatograph machine." 226 P. 3d, at 8–9. Second, SLD analyst Razatos, although he did not participate in testing Bullcoming's blood, "qualified as an expert witness with respect to the gas chromatograph machine." *Id.*, at 9. "Razatos provided live, in-court testimony," the court stated, "and, thus, was available for cross-examination regarding the operation of the . . . machine, the results of [Bullcoming's] BAC test, and the SLD's established laboratory procedures." *Ibid.* Razatos' testimony was crucial, the court explained, because Bullcoming could not cross-examine the machine or the written report. *Id.*, at 10. But "[Bullcoming's] right of confrontation was preserved," the court concluded, because Razatos was a qualified analyst, able to serve as a surrogate for Caylor. *Ibid.*

We granted certiorari to address this question: Does the Confrontation Clause permit the prosecution to introduce

——————

[4] In so ruling, the New Mexico Supreme Court explicitly overruled *State* v. *Dedman*, 2004–NMSC–037, 102 P. 3d 628 (2004), which had classified blood-alcohol reports as public records neither "investigative nor prosecutorial" in nature. 226 P. 3d, at 7–8.

a forensic laboratory report containing a testimonial certi-
fication, made in order to prove a fact at a criminal trial,
through the in-court testimony of an analyst who did not
sign the certification or personally perform or observe the
performance of the test reported in the certification. 561
U. S. ___ (2010). Our answer is in line with controlling
precedent: As a rule, if an out-of-court statement is testi-
monial in nature, it may not be introduced against the
accused at trial unless the witness who made the state-
ment is unavailable and the accused has had a prior op-
portunity to confront that witness. Because the New
Mexico Supreme Court permitted the testimonial state-
ment of one witness, *i.e.*, Caylor, to enter into evidence
through the in-court testimony of a second person, *i.e.*,
Razatos, we reverse that court's judgment.

## II

The Sixth Amendment's Confrontation Clause confers
upon the accused "[i]n all criminal prosecutions, . . . the
right . . . to be confronted with the witnesses against him."
In a pathmarking 2004 decision, *Crawford* v. *Washington*,
we overruled *Ohio* v. *Roberts*, 448 U. S. 56 (1980), which
had interpreted the Confrontation Clause to allow admis-
sion of absent witnesses' testimonial statements based on
a judicial determination of reliability. See *Roberts*, 448
U. S., at 66. Rejecting *Roberts*' "amorphous notions of 're-
liability,'" *Crawford*, 541 U. S., at 61, *Crawford* held
that fidelity to the Confrontation Clause permitted admis-
sion of "[t]estimonial statements of witnesses absent from
trial . . . only where the declarant is unavailable, and only
where the defendant has had a prior opportunity to cross-
examine," *id.*, at 59. See *Michigan* v. *Bryant*, 562 U. S.
___, ___ (2011) (slip op., at 7) ("[F]or testimonial evidence
to be admissible, the Sixth Amendment 'demands what
the common law required: unavailability [of the witness]
and a prior opportunity for cross-examination.'" (quoting

*Crawford*, 541 U. S., at 68)). *Melendez-Diaz*, relying on *Crawford*'s rationale, refused to create a "forensic evidence" exception to this rule. 557 U. S., at ___–___ (slip op., at 11–15).[5] An analyst's certification prepared in connection with a criminal investigation or prosecution, the Court held, is "testimonial," and therefore within the compass of the Confrontation Clause. *Id.*, at ___–___ (slip op., at 15–18).[6]

The State in the instant case never asserted that the analyst who signed the certification, Curtis Caylor, was unavailable. The record showed only that Caylor was placed on unpaid leave for an undisclosed reason. See *supra*, at 5. Nor did Bullcoming have an opportunity to cross-examine Caylor. *Crawford* and *Melendez-Diaz*, therefore, weigh heavily in Bullcoming's favor. The New Mexico Supreme Court, however, although recognizing that the SLD report was testimonial for purposes of the Confrontation Clause, considered SLD analyst Razatos an adequate substitute for Caylor. We explain first why Razatos' appearance did not meet the Confrontation Clause requirement. We next address the State's argument that the SLD report ranks as "nontestimonial," and

———

[5] The dissent makes plain that its objection is less to the application of the Court's decisions in *Crawford* and *Melendez-Diaz* to this case than to those pathmarking decisions themselves. See *post*, at 5 (criticizing the "*Crawford* line of cases" for rejecting "reliable evidence"); *post*, at 8–9, 11 (deploring "*Crawford*'s rejection of the [reliability-centered] regime of *Ohio* v. *Roberts*").

[6] To rank as "testimonial," a statement must have a "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." *Davis* v. *Washington*, 547 U. S. 813, 822 (2006). See also *Bryant*, 562 U. S., at ___ (slip op., at 11). Elaborating on the purpose for which a "testimonial report" is created, we observed in *Melendez-Diaz* that business and public records "are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." 557 U. S., at ___ (slip op., at 18).

therefore "[was] not subject to the Confrontation Clause" in the first place. Brief for Respondent 7 (capitalization omitted).

## A

The New Mexico Supreme Court held surrogate testimony adequate to satisfy the Confrontation Clause in this case because analyst Caylor "simply transcribed the resul[t] generated by the gas chromatograph machine," presenting no interpretation and exercising no independent judgment. 226 P. 3d, at 8. Bullcoming's "true 'accuser,'" the court said, was the machine, while testing analyst Caylor's role was that of "mere scrivener." *Id.*, at 9. Caylor's certification, however, reported more than a machine-generated number. See *supra*, at 3–4.

Caylor certified that he received Bullcoming's blood sample intact with the seal unbroken, that he checked to make sure that the forensic report number and the sample number "correspond[ed]," and that he performed on Bullcoming's sample a particular test, adhering to a precise protocol. App. 62–65. He further represented, by leaving the "[r]emarks" section of the report blank, that no "circumstance or condition . . . affect[ed] the integrity of the sample or . . . the validity of the analysis." *Id.*, at 62, 65. These representations, relating to past events and human actions not revealed in raw, machine-produced data, are meet for cross-examination.

The potential ramifications of the New Mexico Supreme Court's reasoning, furthermore, raise red flags. Most witnesses, after all, testify to their observations of factual conditions or events, *e.g.*, "the light was green," "the hour was noon." Such witnesses may record, on the spot, what they observed. Suppose a police report recorded an objective fact—Bullcoming's counsel posited the address above the front door of a house or the read-out of a radar gun. See Brief for Petitioner 35. Could an officer other than the

one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures? As our precedent makes plain, the answer is emphatically "No." See *Davis* v. *Washington*, 547 U. S. 813, 826 (2006) (Confrontation Clause may not be "evaded by having a note-taking police[ officer] recite the . . . testimony of the declarant" (emphasis deleted)); *Melendez-Diaz*, 557 U. S., at \_\_\_ (slip op., at 6) (KENNEDY, J., dissenting) ("The Court made clear in *Davis* that it will not permit the testimonial statement of one witness to enter into evidence through the in-court testimony of a second.").

The New Mexico Supreme Court stated that the number registered by the gas chromatograph machine called for no interpretation or exercise of independent judgment on Caylor's part. 226 P. 3d, at 8–9. We have already explained that Caylor certified to more than a machine-generated number. See *supra*, at 3–4. In any event, the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar. This Court settled in *Crawford* that the "obviou[s] reliab[ility]" of a testimonial statement does not dispense with the Confrontation Clause. 541 U. S., at 62; see *id.*, at 61 (Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing [the evidence] in the crucible of cross-examination"). Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess "the scientific acumen of Mme. Curie and the veracity of Mother Teresa." *Melendez-Diaz*, 557 U. S., at \_\_\_, n. 6 (slip op., at 14, n. 6).

B

Recognizing that admission of the blood-alcohol analysis

depended on "live, in-court testimony [by] a qualified ana-
lyst," 226 P. 3d, at 10, the New Mexico Supreme Court
believed that Razatos could substitute for Caylor because
Razatos "qualified as an expert witness with respect to the
gas chromatograph machine and the SLD's labora-
tory procedures," *id.*, at 9. But surrogate testimony of the
kind Razatos was equipped to give could not convey what
Caylor knew or observed about the events his certification
concerned, *i.e.*, the particular test and testing process he
employed.[7]  Nor could such surrogate testimony expose
any lapses or lies on the certifying analyst's part.[8]  Signifi-
cant here, Razatos had no knowledge of the reason why
Caylor had been placed on unpaid leave. With Caylor on
the stand, Bullcoming's counsel could have asked ques-
tions designed to reveal whether incompetence, evasive-
ness, or dishonesty accounted for Caylor's removal from
his work station. Notable in this regard, the State never
asserted that Caylor was "unavailable"; the prosecution
conveyed only that Caylor was on uncompensated leave.
Nor did the State assert that Razatos had any "independ-
ent opinion" concerning Bullcoming's BAC. See Brief for
Respondent 58, n. 15. In this light, Caylor's live testimony
could hardly be typed "a hollow formality," *post*, at 4.

   More fundamentally, as this Court stressed in *Craw-
ford*, "[t]he text of the Sixth Amendment does not sug-

————————

   [7] We do not question that analyst Caylor, in common with other ana-
lysts employed by SLD, likely would not recall a particular test, given
the number of tests each analyst conducts and the standard procedure
followed in testing. Even so, Caylor's testimony under oath would have
enabled Bullcoming's counsel to raise before a jury questions concern-
ing Caylor's proficiency, the care he took in performing his work, and
his veracity. In particular, Bullcoming's counsel likely would have
inquired on cross-examination why Caylor had been placed on unpaid
leave.

   [8] At Bullcoming's trial, Razatos acknowledged that "you don't know
unless you actually observe the analysis that someone else conducts,
whether they followed th[e] protocol in every instance." App. 59.

gest any open-ended exceptions from the confrontation requirement to be developed by the courts." 541 U. S., at 54. Nor is it "the role of courts to extrapolate from the words of the [Confrontation Clause] to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values." *Giles* v. *California*, 554 U. S. 353, 375 (2008). Accordingly, the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination.

A recent decision involving another Sixth Amendment right—the right to counsel—is instructive. In *United States* v. *Gonzalez-Lopez*, 548 U. S. 140 (2006), the Government argued that illegitimately denying a defendant his counsel of choice did not violate the Sixth Amendment where "substitute counsel's performance" did not demonstrably prejudice the defendant. *Id.*, at 144–145. This Court rejected the Government's argument. "[T]rue enough," the Court explained, "the purpose of the rights set forth in [the Sixth] Amendment is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair." *Id.*, at 145. If a "particular guarantee" of the Sixth Amendment is violated, no substitute procedure can cure the violation, and "[n]o additional showing of prejudice is required to make the violation 'complete.'" *Id.*, at 146. If representation by substitute counsel does not satisfy the Sixth Amendment, neither does the opportunity to confront a substitute witness.

In short, when the State elected to introduce Caylor's certification, Caylor became a witness Bullcoming had the right to confront. Our precedent cannot sensibly be read any other way. See *Melendez-Diaz*, 557 U. S., at ___ (slip op., at 6) (KENNEDY, J., dissenting) (Court's holding means "the . . . analyst who must testify is the person who signed

the certificate").

### III

We turn, finally, to the State's contention that the SLD's blood-alcohol analysis reports are nontestimonial in character, therefore no Confrontation Clause question even arises in this case. *Melendez-Diaz* left no room for that argument, the New Mexico Supreme Court concluded, see 226 P. 3d, at 7–8; *supra*, at 7, a conclusion we find inescapable.

In *Melendez-Diaz*, a state forensic laboratory, on police request, analyzed seized evidence (plastic bags) and reported the laboratory's analysis to the police (the substance found in the bags contained cocaine). 557 U. S., at ___ (slip op., at 2). The "certificates of analysis" prepared by the analysts who tested the evidence in *Melendez-Diaz*, this Court held, were "incontrovertibly . . . affirmation[s] made for the purpose of establishing or proving some fact" in a criminal proceeding. *Id.*, at ___ (slip op., at 4) (internal quotation marks omitted). The same purpose was served by the certificate in question here.

The State maintains that the affirmations made by analyst Caylor were not "adversarial" or "inquisitorial," Brief for Respondent 27–33; instead, they were simply observations of an "independent scientis[t]" made "according to a non-adversarial public duty," *id.*, at 32–33. That argument fares no better here than it did in *Melendez-Diaz*. A document created solely for an "evidentiary purpose," *Melendez-Diaz* clarified, made in aid of a police investigation, ranks as testimonial. 557 U. S., at ___ (slip op., at 5) (forensic reports available for use at trial are "testimonial statements" and certifying analyst is a "'witness' for purposes of the Sixth Amendment").

Distinguishing Bullcoming's case from *Melendez-Diaz*, where the analysts' findings were contained in certificates "sworn to before a notary public," *id.*, at ___ (slip op., at 2),

the State emphasizes that the SLD report of Bullcoming's BAC was "unsworn." Brief for Respondent 13; *post*, at 2 ("only sworn statement" here was that of Razatos, "who was present and [did] testif[y]"). As the New Mexico Supreme Court recognized, "'the absence of [an] oath [i]s not dispositive' in determining if a statement is testimonial." 226 P. 3d, at 8 (quoting *Crawford*, 541 U. S., at 52). Indeed, in *Crawford*, this Court rejected as untenable any construction of the Confrontation Clause that would render inadmissible only sworn *ex parte* affidavits, while leaving admission of formal, but unsworn statements "perfectly OK." *Id.,* at 52–53, n. 3. Reading the Clause in this "implausible" manner, *ibid.*, the Court noted, would make the right to confrontation easily erasable. See *Davis*, 547 U. S., at 830–831, n. 5; *id.*, at 838 (THOMAS, J., concurring in judgment in part and dissenting in part).

In all material respects, the laboratory report in this case resembles those in *Melendez-Diaz*. Here, as in *Melendez-Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations, N. M. Stat. Ann. §29–3–4 (2004). Like the analysts in *Melendez-Diaz*, analyst Caylor tested the evidence and prepared a certificate concerning the result of his analysis. App. 62. Like the *Melendez-Diaz* certificates, Caylor's certificate is "formalized" in a signed document, *Davis*, 547 U. S., at 837, n. 2 (opinion of THOMAS, J.), headed a "report," App. 62. Noteworthy as well, the SLD report form contains a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses.

In sum, the formalities attending the "report of blood alcohol analysis" are more than adequate to qualify Caylor's assertions as testimonial. The absence of notarization does not remove his certification from Confrontation Clause governance. The New Mexico Supreme Court, guided by *Melendez-Diaz*, correctly recognized that Cay-

lor's report "fell within the core class of testimonial state-
ments" 226 P. 3d, at 7, described in this Court's leading
Confrontation Clause decisions: *Melendez-Diaz*, 557 U. S.,
at ___ (slip op., at 4); *Davis*, 547 U. S., at 830; *Crawford*,
541 U. S., at 51–52.

## IV

The State and its *amici* urge that unbending applica-
tion of the Confrontation Clause to forensic evidence would
impose an undue burden on the prosecution. This argu-
ment, also advanced in the dissent, *post*, at 10–11, largely
repeats a refrain rehearsed and rejected in *Melendez-Diaz*.
See 557 U. S., at ___–___ (slip op., at 19–23). The con-
stitutional requirement, we reiterate, "may not [be] disre-
gard[ed] . . . at our convenience," *id.*, at ___ (slip op., at
19), and the predictions of dire consequences, we again
observe, are dubious, see *id.*, at ___ (slip op., at 19–20).

New Mexico law, it bears emphasis, requires the lab-
oratory to preserve samples, which can be retested by
other analysts, see N. M. Admin. Code §7.33.2.15(A)(4)–(6)
(2010), available at http://www.nmcpr.state.nm.us/nmac/
_title07/T07C033.htm, and neither party questions SLD's
compliance with that requirement. Retesting "is almost
always an option . . . in [DWI] cases," Brief for Public
Defender Service for District of Columbia et al. as *Amici
Curiae* 25 (hereinafter PDS Brief), and the State had that
option here: New Mexico could have avoided any Confron-
tation Clause problem by asking Razatos to retest the
sample, and then testify to the results of his retest rather
than to the results of a test he did not conduct or observe.

Notably, New Mexico advocates retesting as an effective
means to preserve a defendant's confrontation right "when
the [out-of-court] statement is raw data or a mere tran-
scription of raw data onto a public record." Brief for Re-
spondent 53–54. But the State would require the defen-
dant to initiate retesting. *Id.*, at 55; *post*, at 4 (defense

"remains free to . . . . call and examine the technician who performed a test"), *post*, at 8 ("free retesting" is available to defendants). The prosecution, however, bears the burden of proof. *Melendez-Diaz*, 557 U. S., at \_\_\_ (slip op., at 19) ("[T]he Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court."). Hence the obligation to propel retesting when the original analyst is unavailable is the State's, not the defendant's. See *Taylor* v. *Illinois*, 484 U. S. 400, 410, n. 14 (1988) (Confrontation Clause's requirements apply "in every case, whether or not the defendant seeks to rebut the case against him or to present a case of his own").

Furthermore, notice-and-demand procedures, long in effect in many jurisdictions, can reduce burdens on forensic laboratories. Statutes governing these procedures typically "render . . . otherwise hearsay forensic reports admissible[,] while specifically preserving a defendant's right to demand that the prosecution call the author/ analyst of [the] report." PDS Brief 9; see *Melendez-Diaz*, 557 U. S., at \_\_\_ (slip op., at 20) (observing that notice-and-demand statutes "permit the defendant to assert (or forfeit by silence) his Confrontation Clause right after receiving notice of the prosecution's intent to use a forensic analyst's report").

Even before this Court's decision in *Crawford*, moreover, it was common prosecutorial practice to call the forensic analyst to testify. Prosecutors did so "to bolster the persuasive power of [the State's] case[,] . . . [even] when the defense would have preferred that the analyst did *not* testify." PDS Brief 8.

We note also the "small fraction of . . . cases" that "actually proceed to trial." *Melendez-Diaz*, 557 U. S., at \_\_\_ (slip op., at 20) (citing estimate that "nearly 95% of convictions in state and federal courts are obtained via guilty plea"). And, "when cases in which forensic analysis has

been conducted [do] go to trial," defendants "regularly . . . [stipulate] to the admission of [the] analysis." PDS Brief 20. "[A]s a result, analysts testify in only a very small percentage of cases," *id.*, at 21, for "[i]t is unlikely that defense counsel will insist on live testimony whose effect will be merely to highlight rather than cast doubt upon the forensic analysis." *Melendez-Diaz*, 557 U. S., at ___ (slip op., at 22).[9]

Tellingly, in jurisdictions in which "it is the [acknowl-edged] job of . . . analysts to testify in court . . . about their test results," the sky has not fallen. PDS Brief 23. State and municipal laboratories "make operational and staffing decisions" to facilitate analysts' appearance at trial. *Ibid.* Prosecutors schedule trial dates to accommodate analysts' availability, and trial courts liberally grant continuances when unexpected conflicts arise. *Id.*, at 24–25. In rare cases in which the analyst is no longer employed by the laboratory at the time of trial, "the prosecution makes the effort to bring that analyst . . . to court." *Id.*, at 25. And, as is the practice in New Mexico, see *supra*, at 16, labora-tories ordinarily retain additional samples, enabling them to run tests again when necessary.[10]

——————

[9] The dissent argues otherwise, reporting a 71% increase, from 2008 to 2010, in the number of subpoenas for New Mexico analysts' testi-mony in impaired-driving cases. *Post*, at 11. The dissent is silent, however, on the number of instances in which subpoenaed analysts in fact testify, *i.e.*, the figure that would reveal the actual burden of courtroom testimony. Moreover, New Mexico's Department of Health, Scientific Laboratory Division, has attributed the "chaotic" conditions noted by the dissent, *ibid.*, to several favors, among them, staff attri-tion, a state hiring freeze, a 15% increase in the number of blood samples received for testing, and "wildly" divergent responses by New Mexico District Attorneys to *Melendez-Diaz*. Brief for State of New Mexico Dept. of Health, SLD as *Amicus Curiae* 2–5. Some New Mexico District Attorneys' offices, we are informed, "subpoen[a] every analyst with any connection to a blood sample," *id.*, at 5, an exorbitant practice that undoubtedly inflates the number of subpoenas issued.

[10] The dissent refers, selectively, to experience in Los Angeles, *post*, at

\*     \*     \*

For the reasons stated, the judgment of the New Mexico Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.[11]

*It is so ordered.*

———————

10, but overlooks experience documented in Michigan. In that State, post-*Melendez-Diaz*, the increase in in-court analyst testimony has been slight. Compare PDS Brief 21 (in 2006, analysts provided testimony for only 0.7% of all tests), with Michigan State Police, Forensic Science Division, available at http://www.michigan.gov/msp/0,1607,7-123-1593_3800-15901--,00.html (in 2010, analysts provided testimony for approximately 1% of all tests).

  [11] As in *Melendez-Diaz*, 557 U. S., at \_\_\_, and n. 14 (slip op., at 23, and n. 14), we express no view on whether the Confrontation Clause error in this case was harmless. The New Mexico Supreme Court did not reach that question, see Brief for Respondent 59–60, and nothing in this opinion impedes a harmless-error inquiry on remand.

# SUPREME COURT OF THE UNITED STATES

———————

No. 09–10876

———————

## DONALD BULLCOMING, PETITIONER *v.* NEW MEXICO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NEW MEXICO

[June 23, 2011]

JUSTICE SOTOMAYOR, concurring in part.

I agree with the Court that the trial court erred by admitting the blood alcohol concentration (BAC) report. I write separately first to highlight why I view the report at issue to be testimonial—specifically because its "primary purpose" is evidentiary—and second to emphasize the limited reach of the Court's opinion.

I

A

Under our precedents, the New Mexico Supreme Court was correct to hold that the certified BAC report in this case is testimonial. 2010–NMSC–007, ¶18, 226 P. 3d 1, 8.

To determine if a statement is testimonial, we must decide whether it has "a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan* v. *Bryant*, 562 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 11). When the "primary purpose" of a statement is "not to create a record for trial," *ibid.*, "the admissibility of [the] statement is the concern of state and federal rules of evidence, not the Confrontation Clause," *id.*, at \_\_\_ (slip op., at 12).

This is not the first time the Court has faced the question of whether a scientific report is testimonial. As the Court explains, *ante*, at 14–15, in *Melendez-Diaz* v. *Massachusetts,* 557 U. S. \_\_\_ (2009), we held that "certificates

of analysis," completed by employees of the State Laboratory Institute of the Massachusetts Department of Public Health, *id.*, at ___ (slip op., at 2), were testimonial because they were "incontrovertibly . . . '"solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact,"'" *id.*, at ___ (slip op., at 4) (quoting *Crawford* v. *Washington*, 541 U. S. 36, 51 (2004), in turn quoting 2 N. Webster, An American Dictionary of the English Language (1828)).

As we explained earlier this Term in *Michigan* v. *Bryant*, 562 U. S. ___ (2010), "[i]n making the primary purpose determination, standard rules of hearsay . . . will be relevant." *Id.,* at ___ (slip op., at 11–12).[1] As applied to a scientific report, *Melendez-Diaz* explained that pursuant to Federal Rule of Evidence 803, "[d]ocuments kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status," except "if the regularly conducted business activity is the production of evidence for use at trial." 557 U. S., at ___ (slip op., at 15–16) (citing Fed. Rule Evid. 803(6)). In that circumstance, the hearsay rules bar admission of even business records. Relatedly, in the Confrontation Clause context, business and public records "are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz*, 557 U. S., at ___ (slip op., at 18). We concluded, therefore, that because the purpose of the certificates of analysis was use at trial, they were not

_____

[1] Contrary to the dissent's characterization, *Bryant* deemed reliability, as reflected in the hearsay rules, to be "relevant," 562 U. S., at ___ (slip op., at 11–12), not "essential," *post*, at 5 (opinion of KENNEDY, J.). The rules of evidence, not the Confrontation Clause, are designed primarily to police reliability; the purpose of the Confrontation Clause is to determine whether statements are testimonial and therefore require confrontation.

properly admissible as business or public records under the hearsay rules, *id.*, at \_\_\_ (slip op., at 15–16), nor were they admissible under the Confrontation Clause, *id.*, at \_\_\_ (slip op., at 18). The hearsay rule's recognition of the certificates' evidentiary purpose thus confirmed our decision that the certificates were testimonial under the primary purpose analysis required by the Confrontation Clause. See *id.*, at \_\_\_ (slip op., at 5) (explaining that under Massachusetts law not just the purpose but the "*sole purpose* of the affidavits was to provide" evidence).

Similarly, in this case, for the reasons the Court sets forth the BAC report and Caylor's certification on it clearly have a "primary purpose of creating an out-of-court substitute for trial testimony." *Bryant*, 562 U. S., at \_\_\_ (slip op., at 11). The Court also explains why the BAC report is not materially distinguishable from the certificates we held testimonial in *Melendez-Diaz.* See 557 U. S., at \_\_\_ (slip op., at 2, 4–5).[2]

The formality inherent in the certification further suggests its evidentiary purpose. Although "[f]ormality is not the sole touchstone of our primary purpose inquiry," a statement's formality or informality can shed light on whether a particular statement has a primary purpose of use at trial. *Bryant*, 562 U. S., at \_\_\_ (slip op., at 19).[3]

––––––––––

[2] This is not to say, however, that every person noted on the BAC report must testify. As we explained in *Melendez-Diaz*, it is not the case "that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case . . . . It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence . . . ." 557 U. S., at \_\_\_, n. 1 (slip op., at 5, n. 1).

[3] By looking to the formality of a statement, we do not "trea[t] the reliability of evidence as a reason to exclude it." *Post*, at 5 (KENNEDY, J., dissenting). Although in some instances formality could signal reliability, the dissent's argument fails to appreciate that, under our Confrontation Clause precedents, formality is primarily an indicator of testi-

I agree with the Court's assessment that the certificate at issue here is a formal statement, despite the absence of notarization. *Ante*, at 14–15; *Crawford*, 541 U. S., at 52 ("[T]he absence of [an] oath [is] not dispositive"). The formality derives from the fact that the analyst is asked to sign his name and "certify" to both the result and the statements on the form. A "certification" requires one "[t]o attest" that the accompanying statements are true. Black's Law Dictionary 258 (9th ed. 2009) (definition of "certify"); see also *id.*, at 147 (defining "attest" as "[t]o bear witness; testify," or "[t]o affirm to be true or genuine; to authenticate by signing as a witness").

In sum, I am compelled to conclude that the report has a "primary purpose of creating an out-of-court substitute for trial testimony," *Bryant*, 562 U. S., at ___ (slip op., at 11), which renders it testimonial.

### B

After holding that the report was testimonial, the New Mexico Supreme Court nevertheless held that its admission was permissible under the Confrontation Clause for two reasons: because Caylor was a "mere scrivener," and because Razatos could be cross-examined on the workings of the gas chromatograph and laboratory procedures. 226 P. 3d, at 8–10. The Court convincingly explains why those

––––––––––

monial purpose. Formality is not the sole indicator of the testimonial nature of a statement because it is too easily evaded. See *Davis* v. *Washington*, 547 U. S. 813, 838 (2006) (THOMAS, J., concurring in judgment in part and dissenting in part). Nonetheless formality has long been a hallmark of testimonial statements because formality suggests that the statement is intended for use at trial. As we explained in *Bryant*, informality, on the other hand, "does not necessarily indicate . . . lack of testimonial intent." 562 U. S., at ___ (slip op., at 19). The dissent itself recognizes the relevance of formality to the testimonial inquiry when it notes the formality of the problematic unconfronted statements in Sir Walter Raleigh's trial. *Post*, at 7–8 (opinion of KENNEDY, J.).

rationales are incorrect. *Ante*, at 9–13. Therefore, the New Mexico court contravened our precedents in holding that the report was admissible via Razatos' testimony.

## II

Although this case is materially indistinguishable from the facts we considered in *Melendez-Diaz*, I highlight some of the factual circumstances that this case does *not* present.

First, this is not a case in which the State suggested an alternate purpose, much less an alternate *primary* purpose, for the BAC report. For example, the State has not claimed that the report was necessary to provide Bullcoming with medical treatment. See *Bryant*, 562 U. S., at \_\_\_ , n. 9 (slip op., at 15, n. 9) (listing "Statements for Purposes of Medical Diagnosis or Treatment" under Federal Rule of Evidence 803(4) as an example of statements that are "by their nature, made for a purpose other than use in a prosecution"); *Melendez-Diaz*, 557 U. S., at \_\_\_, n. 2 (slip op., at 6, n. 2) ("[M]edical reports created for treatment purposes . . . would not be testimonial under our decision today"); *Giles* v. *California*, 554 U. S. 353, 376 (2008) ("[S]tatements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules").

Second, this is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue. Razatos conceded on cross-examination that he played no role in producing the BAC report and did not observe any portion of Curtis Caylor's conduct of the testing. App. 58. The court below also recognized Razatos' total lack of connection to the test at issue. 226 P. 3d, at 6. It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results. We need not ad-

dress what degree of involvement is sufficient because here Razatos had no involvement whatsoever in the relevant test and report.

Third, this is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence. See Fed. Rule Evid. 703 (explaining that facts or data of a type upon which experts in the field would reasonably rely in forming an opinion need not be admissible in order for the expert's opinion based on the facts and data to be admitted). As the Court notes, *ante*, at 12, the State does not assert that Razatos offered an independent, expert opinion about Bullcoming's blood alcohol concentration. Rather, the State explains, "[a]side from reading a report that was introduced as an exhibit, Mr. Razatos offered no opinion about Petitioner's blood alcohol content . . . ." Brief for Respondent 58, n. 15 (citation omitted). Here the State offered the BAC report, including Caylor's testimonial statements, into evidence. We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence.

Finally, this is not a case in which the State introduced only machine-generated results, such as a printout from a gas chromatograph. The State here introduced Caylor's statements, which included his transcription of a blood alcohol concentration, apparently copied from a gas chromatograph printout, along with other statements about the procedures used in handling the blood sample. See *ante*, at 10; App. 62 ("I certify that I followed the procedures set out on the reverse of this report, and the statements in this block are correct"). Thus, we do not decide whether, as the New Mexico Supreme Court suggests, 226 P. 3d, at 10, a State could introduce (assuming an adequate chain of custody foundation) raw data generated by

a machine in conjunction with the testimony of an expert witness. See Reply Brief for Petitioner 16, n. 5.

This case does not present, and thus the Court's opinion does not address, any of these factual scenarios.

\*     \*     \*

As in *Melendez-Diaz*, the primary purpose of the BAC report is clearly to serve as evidence. It is therefore testimonial, and the trial court erred in allowing the State to introduce it into evidence via Razatos' testimony. I respectfully concur.

# SUPREME COURT OF THE UNITED STATES

———————

No. 09–10876

———————

## DONALD BULLCOMING, PETITIONER *v.* NEW MEXICO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NEW MEXICO

[June 23, 2011]

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE BREYER, and JUSTICE ALITO join, dissenting.

The Sixth Amendment Confrontation Clause binds the States and the National Government. *Pointer* v. *Texas*, 380 U. S. 400, 403 (1965). Two Terms ago, in a case arising from a state criminal prosecution, the Court interpreted the Clause to mandate exclusion of a laboratory report sought to be introduced based on the authority of that report's own sworn statement that a test had been performed yielding the results as shown. *Melendez-Diaz* v. *Massachusetts*, 557 U. S. ___ (2009). The Court's opinion in that case held the report inadmissible because no one was present at trial to testify to its contents.

Whether or not one agrees with the reasoning and the result in *Melendez-Diaz*, the Court today takes the new and serious misstep of extending that holding to instances like this one. Here a knowledgeable representative of the laboratory was present to testify and to explain the lab's processes and the details of the report; but because he was not the analyst who filled out part of the form and transcribed onto it the test result from a machine printout, the Court finds a confrontation violation. Some of the principal objections to the Court's underlying theory have been set out earlier and need not be repeated here. See *id.,* at ___ (KENNEDY, J., dissenting). Additional reasons, appli-

cable to the extension of that doctrine and to the new ruling in this case, are now explained in support of this respectful dissent.

I

Before today, the Court had not held that the Confrontation Clause bars admission of scientific findings when an employee of the testing laboratory authenticates the findings, testifies to the laboratory's methods and practices, and is cross-examined at trial. Far from replacing live testimony with "systematic" and "extrajudicial" examinations, *Davis* v. *Washington,* 547 U. S. 813*,* 835, 836 (2006) (THOMAS, J., concurring in judgment in part and dissenting in part) (emphasis deleted and internal quotation marks omitted), these procedures are fully consistent with the Confrontation Clause and with well-established principles for ensuring that criminal trials are conducted in full accord with requirements of fairness and reliability and with the confrontation guarantee. They do not "resemble Marian proceedings." *Id.,* at 837.

The procedures followed here, but now invalidated by the Court, make live testimony rather than the "solemnity" of a document the primary reason to credit the laboratory's scientific results. *Id.,* at 838. Unlike *Melendez-Diaz*, where the jury was asked to credit a laboratory's findings based solely on documents that were "quite plainly affidavits," 557 U. S., at ___ (slip op., at 1) (THOMAS, J., concurring) (internal quotation marks omitted), here the signature, heading, or legend on the document were routine authentication elements for a report that would be assessed and explained by in-court testimony subject to full cross-examination. The only sworn statement at issue was that of the witness who was present and who testified.

The record reveals that the certifying analyst's role here was no greater than that of anyone else in the chain of

custody. App. 56 (laboratory employee's testimony agreeing that "once the material is prepared and placed in the machine, you don't need any particular expertise to record the results"). The information contained in the report was the result of a scientific process comprising multiple participants' acts, each with its own evidentiary significance. These acts included receipt of the sample at the laboratory; recording its receipt; storing it; placing the sample into the testing device; transposing the printout of the results of the test onto the report; and review of the results. See *Id.,* at 48–56; see also Brief for State of New Mexico Dept. of Health Scientific Laboratory Division as *Amicus Curiae* 4 (hereinafter New Mexico Scientific Laboratory Brief) ("Each blood sample has original testing work by . . . as many as seve[n] analysts . . . ."); App. 62 (indicating that this case involved three laboratory analysts who, respectively, received, analyzed, and reviewed analysis of the sample); cf. Brief for State of Indiana et al. as *Amici Curiae* in *Briscoe* v. *Virginia,* O. T. 2009, No. 07–11191, p. 10 (hereinafter Indiana Brief) (explaining that DNA analysis can involve the combined efforts of up to 40 analysts).

In the New Mexico scientific laboratory where the blood sample was processed, analyses are run in batches involving 40–60 samples. Each sample is identified by a computer-generated number that is not linked back to the file containing the name of the person from whom the sample came until after all testing is completed. See New Mexico Scientific Laboratory Brief 26. The analysis is mechanically performed by the gas chromatograph, which may operate—as in this case—after all the laboratory employees leave for the day. See *id.,* at 17. And whatever the result, it is reported to both law enforcement and the defense. See *id.,* at 36.

The representative of the testing laboratory whom the prosecution called was a scientific analyst named Mr.

Razatos. He testified that he "help[ed] in overseeing the administration of these programs throughout the State," and he was qualified to answer questions concerning each of these steps. App. 49. The Court has held that the government need not produce at trial "everyone who laid hands on the evidence," *Melendez-Diaz, supra*, at ___, n. 1 (slip op., at 5, n. 1). Here, the defense used the opportunity in cross-examination to highlight the absence at trial of certain laboratory employees. Under questioning by Bullcoming's attorney, Razatos acknowledged that his name did not appear on the report; that he did not receive the sample, perform the analysis, or complete the review; and that he did not know the reason for some personnel decisions. App. 58. After weighing arguments from defense counsel concerning these admissions, and after considering the testimony of Mr. Razatos, who knew the laboratory's protocols and processes, the jury found no reasonable doubt as to the defendant's guilt.

In these circumstances, requiring the State to call the technician who filled out a form and recorded the results of a test is a hollow formality. The defense remains free to challenge any and all forensic evidence. It may call and examine the technician who performed a test. And it may call other expert witnesses to explain that tests are not always reliable or that the technician might have made a mistake. The jury can then decide whether to credit the test, as it did here. The States, furthermore, can assess the progress of scientific testing and enact or adopt statutes and rules to ensure that only reliable evidence is admitted. Rejecting these commonsense arguments and the concept that reliability is a legitimate concern, the Court today takes a different course. It once more assumes for itself a central role in mandating detailed evidentiary rules, thereby extending and confirming *Melendez-Diaz*'s "vast potential to disrupt criminal procedures." 557 U. S., at ___ (slip op., at 3) (KENNEDY, J.,

dissenting).

## II

The protections in the Confrontation Clause, and indeed the Sixth Amendment in general, are designed to ensure a fair trial with reliable evidence. But the *Crawford* v. *Washington,* 541 U. S. 36 (2004), line of cases has treated the reliability of evidence as a reason to exclude it. *Id.*, at 61–62. Today, for example, the Court bars admission of a lab report because it "is formalized in a signed document." *Ante*, at 15 (internal quotation marks omitted). The Court's unconventional and unstated premise is that the State—by acting to ensure a statement's reliability— makes the statement more formal and therefore less likely to be admitted. Park, Is Confrontation the Bottom Line? 19 Regent U. L. Rev. 459, 461 (2007). That is so, the Court insists, because reliability does not animate the Confrontation Clause. *Ante*, at 11; *Melendez-Diaz*, *supra*, at \_\_\_ (slip op., at 11–12); *Crawford*, *supra*, at 61–62. Yet just this Term the Court ruled that, in another confrontation context, reliability was an essential part of the constitutional inquiry. See *Michigan* v. *Bryant*, 562 U. S. \_\_\_, \_\_\_–\_\_\_, \_\_\_–\_\_\_ (2010) (slip op., at 11–12, 14–15).

Like reliability, other principles have weaved in and out of the *Crawford* jurisprudence. Solemnity has sometimes been dispositive, see *Melendez-Diaz*, 557 U. S., at \_\_\_ (slip op., at 6); *id.*, at \_\_\_ (slip op., at 1) (THOMAS, J., concurring), and sometimes not, see *Davis*, 547 U. S., at 834–837, 841 (THOMAS, J., concurring in judgment in part and dissenting in part). So, too, with the elusive distinction between utterances aimed at proving past events, and those calculated to help police keep the peace. Compare *Davis, supra*, and *Bryant*, 562 U. S., at \_\_\_–\_\_\_ (slip op., at 24–30), with *id.*, at \_\_\_–\_\_\_ (slip op., at 5–9) (SCALIA, J., dissenting).

It is not even clear which witnesses' testimony could

render a scientific report admissible under the Court's approach. *Melendez-Diaz* stated an inflexible rule: Where "analysts' affidavits" included "testimonial statements," defendants were "entitled to be confronted with the analysts" themselves. 557 U. S., at ___ (slip op., at 5) (internal quotation marks omitted). Now, the Court reveals, this rule is either less clear than it first appeared or too strict to be followed. A report is admissible, today's opinion states, if a "live witness competent to testify to the truth of the statements made in the report" appears. *Ante*, at 1. Such witnesses include not just the certifying analyst, but also any "scientist who . . . perform[ed] or observe[d] the test reported in the certification." *Ante*, at 2.

Today's majority is not committed in equal shares to a common set of principles in applying the holding of *Crawford*. Compare *Davis*, *supra* (opinion for the Court by SCALIA, J.), with *id.*, at 834 (THOMAS, J., concurring in judgment in part and dissenting in part); and *Bryant*, *supra*, (opinion for the Court by SOTOMAYOR, J.), with *id.*, at ___ (THOMAS, J., concurring in judgment), and *id.*, at ___ (SCALIA, J., dissenting), and *id.*, at ___ (GINSBURG, J., dissenting); and *ante*, at ___ (slip op., at 1) (opinion of the Court), with *ante,* at ___ (slip op., at 1) (SOTOMAYOR, J., concurring). That the Court in the wake of *Crawford* has had such trouble fashioning a clear vision of that case's meaning is unsettling; for *Crawford* binds every judge in every criminal trial in every local, state, and federal court in the Nation. This Court's prior decisions leave trial judges to "guess what future rules this Court will distill from the sparse constitutional text," *Melendez-Diaz, supra,* at ___ (slip op., at 2) (KENNEDY, J., dissenting), or to struggle to apply an "amorphous, if not entirely subjective," "highly context-dependent inquiry" involving "open-ended balancing." *Bryant, supra,* at ___ (slip op., at 15–16) (SCALIA, J., dissenting) (internal quotation marks omitted) (listing 11 factors relevant under the majority's approach).

The persistent ambiguities in the Court's approach are symptomatic of a rule not amenable to sensible applications. Procedures involving multiple participants illustrate the problem. In *Melendez-Diaz* the Court insisted that its opinion did not require everyone in the chain of custody to testify but then qualified that "what testimony *is* introduced must . . . be introduced live." 557 U. S., at ___, n. 1 (slip op., at 5, n. 1); *ante*, at 6, n. 2. This could mean that a statement that evidence remained in law-enforcement custody is admissible if the statement's maker appears in court. If so, an intern at police headquarters could review the evidence log, declare that chain of custody was retained, and so testify. The rule could also be that that the intern's statement—which draws on statements in the evidence log—is inadmissible unless every officer who signed the log appears at trial. That rule, if applied to this case, would have conditioned admissibility of the report on the testimony of three or more identified witnesses. See App. 62. In other instances, 7 or even 40 witnesses could be required. See *supra,* at 3. The court has thus—in its fidelity to *Melendez-Diaz*—boxed itself into a choice of evils: render the Confrontation Clause pro forma or construe it so that its dictates are unworkable.

## III

*Crawford* itself does not compel today's conclusion. It is true, as *Crawford* confirmed, that the Confrontation Clause seeks in part to bar the government from replicating trial procedures outside of public view. See 541 U. S., at 50; *Bryant, supra,* at ___ (slip op., at 11–12). *Crawford* explained that the basic purpose of the Clause was to address the sort of abuses exemplified at the notorious treason trial of Sir Walter Raleigh. 541 U. S., at 51. On this view the Clause operates to bar admission of out-of-court statements obtained through formal interrogation in

preparation for trial. The danger is that innocent defendants may be convicted on the basis of unreliable, untested statements by those who observed—or claimed to have observed—preparation for or commission of the crime. And, of course, those statements might not have been uttered at all or—even if spoken—might not have been true.

A rule that bars testimony of that sort, however, provides neither cause nor necessity to impose a constitutional bar on the admission of impartial lab reports like the instant one, reports prepared by experienced technicians in laboratories that follow professional norms and scientific protocols. In addition to the constitutional right to call witnesses in his own defense, the defendant in this case was already protected by checks on potential prosecutorial abuse such as free retesting for defendants; result-blind issuance of reports; testing by an independent agency; routine processes performed en masse, which reduce opportunities for targeted bias; and labs operating pursuant to scientific and professional norms and oversight. See Brief for Respondent 5, 14–15, 41, 54; New Mexico Scientific Laboratory Brief 2, 26.

In addition to preventing the State from conducting *ex parte* trials, *Crawford*'s rejection of the regime of *Ohio* v. *Roberts*, 448 U. S. 56 (1980), seemed to have two underlying jurisprudential objectives. One was to delink the intricacies of hearsay law from a constitutional mandate; and the other was to allow the States, in their own courts and legislatures and without this Court's supervision, to explore and develop sensible, specific evidentiary rules pertaining to the admissibility of certain statements. These results were to be welcomed, for this Court lacks the experience and day-to-day familiarity with the trial process to suit it well to assume the role of national tribunal for rules of evidence. Yet far from pursuing these objectives, the Court rejects them in favor of their oppo-

sites.

Instead of freeing the Clause from reliance on hearsay doctrines, the Court has now linked the Clause with hearsay rules in their earliest, most rigid, and least refined formulations. See, *e.g.*, Mosteller, Remaking Confrontation Clause and Hearsay Doctrine Under the Challenge of Child Sexual Abuse Prosecutions, 1993 U. Ill. L. Rev. 691, 739–740, 742, 744–746; Gallanis, The Rise of Modern Evidence Law, 84 Iowa L. Rev. 499, 502–503, 514–515, 533–537 (1999). In cases like *Melendez-Diaz* and this one, the Court has tied the Confrontation Clause to 18th century hearsay rules unleavened by principles tending to make those rules more sensible. Sklansky, Hearsay's Last Hurrah, 2009 S. Ct. Rev. 1, 5–6, 36. As a result, the Court has taken the Clause far beyond its most important application, which is to forbid sworn, *ex parte,* out-of-court statements by unconfronted and available witnesses who observed the crime and do not appear at trial.

Second, the States are not just at risk of having some of their hearsay rules reviewed by this Court. They often are foreclosed now from contributing to the formulation and enactment of rules that make trials fairer and more reliable. For instance, recent state laws allowing admission of well-documented and supported reports of abuse by women whose abusers later murdered them must give way, unless that abuser murdered with the specific purpose of foreclosing the testimony. *Giles* v. *California*, 554 U. S. 353 (2008); Sklansky, *supra,* at 14–15. Whether those statutes could provide sufficient indicia of reliability and other safeguards to comply with the Confrontation Clause as it should be understood is, to be sure, an open question. The point is that the States cannot now participate in the development of this difficult part of the law.

In short, there is an ongoing, continued, and systemic displacement of the States and dislocation of the federal structure. Cf. *Melendez-Diaz, supra,* at \_\_\_, \_\_\_, \_\_\_ (slip

op., at 2–3, 22–23). If this Court persists in applying wooden formalism in order to bar reliable testimony offered by the prosecution—testimony thought proper for many decades in state and federal courts committed to devising fair trial processes—then the States might find it necessary and appropriate to enact statutes to accommodate this new, intrusive federal regime. If they do, those rules could remain on State statute books for decades, even if subsequent decisions of this Court were to better implement the objectives of *Crawford.* This underscores the disruptive, long-term structural consequences of decisions like the one the Court announces today.

States also may decide it is proper and appropriate to enact statutes that require defense counsel to give advance notice if they are going to object to introduction of a report without the presence in court of the technician who prepared it. Indeed, today's opinion relies upon laws of that sort as a palliative to the disruption it is causing. *Ante,* at 17 (plurality opinion). It is quite unrealistic, however, to think that this will take away from the defense the incentives to insist on having the certifying analyst present. There is in the ordinary case that proceeds to trial no good reason for defense counsel to waive the right of confrontation as the Court now interprets it.

Today's opinion repeats an assertion from *Melendez-Diaz* that its decision will not "impose an undue burden on the prosecution." *Ante,* at 16 (plurality opinion). But evidence to the contrary already has begun to mount. See, *e.g.,* Brief for State of California et al. as *Amici Curiae* 7 (explaining that the 10 toxicologists for the Los Angeles Police Department spent 782 hours at 261 court appearances during a 1-year period); Brief for National District Attorneys Assocation et al. as *Amici Curiae* 23 (observing that each blood-alcohol analyst in California processes 3,220 cases per year on average). New and more rigorous empirical studies further detailing the unfortunate effects

of *Melendez-Diaz* are sure to be forthcoming.

In the meantime, New Mexico's experience exemplifies the problems ahead. From 2008 to 2010, subpoenas requiring New Mexico analysts to testify in impaired-driving cases rose 71%, to 1,600—or 8 or 9 every workday. New Mexico Scientific Laboratory Brief 2. In a State that is the Nation's fifth largest by area and that employs just 10 total analysts, *id.,* at 3, each analyst in blood alcohol cases recently received 200 subpoenas per year, *id.,* at 33. The analysts now must travel great distances on most working days. The result has been, in the laboratory's words, "chaotic." *Id.,* at 5. And if the defense raises an objection and the analyst is tied up in another court proceeding; or on leave; or absent; or delayed in transit; or no longer employed; or ill; or no longer living, the defense gets a windfall. As a result, good defense attorneys will object in ever-greater numbers to a prosecution failure or inability to produce laboratory analysts at trial. The concomitant increases in subpoenas will further impede the state laboratory's ability to keep pace with its obligations. Scarce state resources could be committed to other urgent needs in the criminal justice system.

\*     \*     \*

Seven years after its initiation, it bears remembering that the *Crawford* approach was not preordained. This Court's missteps have produced an interpretation of the word "witness" at odds with its meaning elsewhere in the Constitution, including elsewhere in the Sixth Amendment, see Amar, Sixth Amendment First Principles, 84 Geo. L. J. 641, 647, 691–696 (1996), and at odds with the sound administration of justice. It is time to return to solid ground. A proper place to begin that return is to decline to extend *Melendez-Diaz* to bar the reliable, commonsense evidentiary framework the State sought to follow in this case.