[968 NYS2d 211]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STEVEN RAUCCI, Appellant.

Third Department, June 27, 2013

APPEARANCES OF COUNSEL

*Hancock Estabrook, LLP*, Syracuse (*Alan J. Pierce* of counsel), for appellant.

*Robert M. Carney, District Attorney,* Schenectady (*Gerald A. Dwyer* of counsel), for respondent.

### OPINION OF THE COURT

EGAN Jr., J.

From 1973 until his arrest in February 2009, defendant was employed by the Schenectady City School District—most recently in the capacity of director of facilities—and, from 2001 until the time of his arrest, defendant also served as the president of his local union unit. Following a wave of vandalism directed at residences or vehicles belonging to, among others, former District employees Harold Gray, Ronald Kriss and Gary DiNola, defendant was charged in a 26-count indictment with various crimes—the most serious of which was arson in the first degree (two counts). A lengthy trial ensued, at the conclusion of which the jury found defendant guilty of arson in the first degree, criminal possession of a weapon in the first degree (three counts), attempted criminal mischief in the first degree (two counts), attempted arson in the third degree (two counts), criminal mischief in the second degree (five counts), criminal mischief in the third degree (three counts), attempted coercion in the first degree and conspiracy in the fourth degree.[1] Defendant thereafter was sentenced to an aggregate prison term of 23 years to life and was ordered to pay restitution. This appeal by defendant ensued.

We affirm. Defendant initially contends that County Court lacked geographic jurisdiction over the 14 counts of the indictment alleging conduct that occurred in Albany, Rensselaer and Saratoga Counties, arguing that the People failed to particularize the harm caused to Schenectady County by defendant's conduct and, thus, the indictment was defective as to those counts.[2] At the outset, we note that, in order for prosecutorial jurisdiction to lie in Schenectady County for the extraterritorial crimes, defendant's conduct must have "had, or was likely to have, a particular effect upon [the] [C]ounty . . . or part thereof,

1. Counts 17 through 19 were severed prior to trial and ultimately were dismissed, and count 25 was dismissed at the close of the People's case. Defendant was convicted of 18 of the remaining 22 counts.

2. County Court denied defendant's motion to dismiss the indictment in this regard and, following trial, defendant was convicted of 12 of the 14 extraterritorial charges. County Court also denied defendant's posttrial motion seeking dismissal of those charges upon the ground that the People failed to satisfy their burden of proving geographic jurisdiction by a preponderance of the evidence.

and [have been] performed with intent that it would, or with knowledge that it was likely to, have such particular effect therein" (CPL 20.40 [2] [c]).[3] To that end, criminal conduct has a "particular effect" upon a county when the consequences thereof "have a materially harmful impact upon the governmental processes or community welfare" of that county (CPL 20.10 [4]) such that the defendant's out-of-county conduct "expose[s] a large number of county residents to a specific harm" (*Matter of Taub v Altman*, 3 NY3d 30, 36 [2004]).[4] In this regard, the injury alleged must be "concrete and identifiable" and of the type that can be demonstrated by proof (*Matter of Steingut v Gold*, 42 NY2d 311, 318 [1977]; *see People v Zimmerman*, 9 NY3d 421, 426 [2007]). The People bear the burden of proving that venue is proper by a preponderance of the evidence, and whether the subject county has geographic jurisdiction over each of the charged offenses presents a factual issue for the jury to resolve (*see People v Ribowsky*, 77 NY2d 284, 291-292 [1991]; *Matter of Arcuri v Kirk*, 231 AD2d 962, 964 [1996]).

    ██ Initially, we reject defendant's contention that the indictment was facially insufficient in that it failed to specify the particular effect upon Schenectady County. Although the indictment admittedly did little more than mimic the statutory language of CPL 20.40 (2) (c), the People's bill of particulars set forth, in detail, their theory of venue and the specific facts to support their contention that defendant's conduct in Albany, Rensselaer and Saratoga Counties affected the policies and procedures of the District, the local union unit and, in turn, the hundreds of District employees and union members that lived or worked in Schenectady County on a daily basis. Moreover, the District Attorney's affirmation in response to defendant's omnibus motion amplified the People's theory of the prosecution and included specific details as to the alleged injury to Schenectady County.[5] Accordingly, when considered together, the bill of particulars, the District Attorney's affirmation and

---

    3. Notably, defendant does not allege that he lacked the necessary intent for particular effect jurisdiction to apply; rather, he argues that there was no perceptible impact upon Schenectady County.

    4. *Matter of Taub* appears to have broadened the holding of *People v Fea* (47 NY2d 70 [1979]), wherein the Court of Appeals noted that the underlying criminal conduct must be intended "to cause a materially harmful impact, not to any particular individual, but rather to the well being of the community as a whole" (*id.* at 77).

    5. The People consented to treat the affirmation as a further amplification of their bill of particulars.

the indictment sufficiently apprised defendant of the charges against him, as well as the basis upon which Schenectady County was asserting geographic jurisdiction (*see Matter of Taub v Altman*, 3 NY3d at 40; *People v Cockett*, 95 AD3d 1230, 1231 [2012], *lv denied* 19 NY3d 958 [2012]; *compare Matter of Steingut v Gold*, 42 NY2d at 318; *see generally People v Perez*, 93 AD3d 1032, 1034-1035 [2012], *lv denied* 19 NY3d 1000 [2012]; *People v Palmer*, 7 AD3d 472, 472 [2004], *lv denied* 3 NY3d 710 [2004]).

The record also reveals that the People demonstrated by a preponderance of the evidence that defendant's out-of-county conduct had, or was likely to have, a "materially harmful impact" (CPL 20.10 [4]) upon a significant number of individuals who either resided in Schenectady County or worked directly with students and others who resided in Schenectady County (*see People v Cockett*, 95 AD3d at 1231; *Matter of Arcuri v Kirk*, 231 AD2d at 963-964; *compare Matter of Taub v Altman*, 3 NY3d at 38-39). The testimony of the victims, as well as other District employees, revealed that defendant used the acts committed in Saratoga and Rensselaer Counties,[6] in conjunction with similar acts committed in Schenectady County, to develop and sustain a reputation as a dangerous man to cross—a reputation he cultivated for the express purpose of exerting control over his own employees and other District employees, and gaining influence over the local school board, District administrators and union officials. Specifically, a number of defendant's employees testified that they were aware that explosive devices similar to those used in the extraterritorial crimes were kept by defendant in plain view in his office at the middle school and in the truck he drove to and from work. This knowledge, together with generalized threats made by defendant against anyone who challenged him, as well as specific threats made against individuals who he believed were working against him, led his employees to fear for their jobs and to fear retaliation if they lodged any complaints against defendant. Indeed, defendant's employees believed that he had retaliated against Harold Gray and Deborah Gray by, among other things, defacing their automobiles and their Saratoga County home. In this regard, the People elicited testimony that defendant led a convoy of approximately 12 employees—in District vehicles during work hours—to view the damage, which included the word "RAT"

---

6. Defendant was acquitted of the sole count of the indictment alleging acts committed in Albany County.

painted in red on the house, a word often used by defendant to describe individuals who he believed were working against him.

Additionally, defendant's intimidation techniques also resulted in a drop in grievances by his employees, a fact that he exploited with District administrators and arguably led to defendant obtaining greater responsibilities—and higher remuneration—from the District. Defendant also required his employees to campaign for school board members during work hours in an attempt to curry favor with those elected officials. As an apparent result of these efforts, conflicts between defendant and his employees or other District employees went unaddressed by his superiors—sometimes with direct impact upon the students. Indeed, defendant's conflict with DiNola, the District's Director of Wellness and School Activities, regarding defendant's decision to restrict access to athletic facilities and outdoor field lighting was ignored despite DiNola's repeated complaints to District administrators that the safety of District and visiting students, as well as the many members of the public who attend athletic events, was in jeopardy. Defendant retaliated against DiNola by leaving a lit explosive device on DiNola's automobile outside his Saratoga County home, which DiNola testified terrorized him and his family and caused him to stop advocating for these issues. In addition, defendant's involvement in the damage to, and attempted bombing of, Laura Balogh's Rensselaer County home stemmed from defendant's relationship with Joanne DeSarbo, who was the president of the local union that included the unit of which defendant was president. Defendant's close friendship with DeSarbo, coupled with the fact that she and other union officials ignored complaints that defendant's status as both unit president and director of facilities—a management position—resulted in a patent conflict of interest, served to further cement defendant's reputation as being untouchable.

In sum, the evidence shows that the intended and actual impact of defendant's use of explosive devices and other menacing acts in Rensselaer and Saratoga Counties was to unleash fear and intimidation that flowed back into the District, touching—on a broader level—virtually everyone within its boundaries (cf. *People v Fea*, 47 NY2d 70, 77-78 [1979]; Briggs, Cambereri, Coffey, Mehler, Schwartz & Shapiro, 1-2 New York Criminal Practice § 2.08 [4] [c]). Given the District's size—21 schools—and its vital role both in the community (*see generally Campaign for Fiscal Equity v State of New York*, 100 NY2d 893,

901-902 [2003]) and as a political subdivision of the state (*see generally City of New York v State of New York*, 86 NY2d 286, 289-290 [1995]), we find the evidence sufficient for the jury to conclude that Schenectady County had geographic jurisdiction over the extraterritorial crimes of which defendant was convicted (*see* CPL 20.10 [4]; 20.40 [2] [c]).

[█] Defendant next contends that County Court abused its discretion in refusing to sever counts 1-3, 5-12, 14, 20 and 26 of the indictment; specifically, defendant asserts that count 2 (charging arson in the first degree as to a residence belonging to Frederick Apfel) was not properly joined and that the remaining enumerated counts should have been severed—generally by victim—as a matter of discretion pursuant to CPL 200.20 (3). We do not agree.

The People may join multiple offenses within a single indictment where—insofar as is relevant here—proof of either offense would be "material and admissible" as evidence-in-chief upon a trial of the other offense (CPL 200.20 [2] [b]). Notably, evidence may be deemed material and admissible within the meaning of CPL 200.20 (2) (b) if such proof would be admissible under any of the recognized *Molineux* exceptions (*see People v Nelson*, 233 AD2d 926, 926 [1996]), including motive (*see People v Kelley*, 46 AD3d 1329, 1331-1332 [2007], *lv denied* 10 NY3d 813 [2008]), intent (*see People v Carter*, 74 AD3d 1375, 1378 [2010], *lv denied* 15 NY3d 772 [2010]; *People v Griffin*, 26 AD3d 594, 594-595 [2006], *lv denied* 7 NY3d 756 [2006]) and modus operandi (*see People v Comfort*, 31 AD3d 1110, 1112 [2006], *lv denied* 7 NY3d 847 [2006]; *People v Zinaman*, 259 AD2d 327, 327 [1999], *lv denied* 93 NY2d 931 [1999]; *People v Jones*, 236 AD2d 846, 846 [1997]). Additionally, offenses may be joined where, although based upon different criminal transactions, "such offenses are defined by the same or similar statutory provisions" (CPL 200.20 [2] [c]; *see People v Rogers*, 94 AD3d 1246, 1248 [2012], *lv denied* 19 NY3d 977 [2012]). If the offenses at issue were joined *solely* because they were based upon the same or similar statutes, a court may—"in the interest of justice and for good cause shown"—order that such offenses be tried separately (CPL 200.20 [3]; *see People v Pirillo*, 78 AD3d 1424, 1425 [2010]). If, however, the offenses were joined upon any other basis identified in the statute (*see* CPL 200.20 [2] [a], [b], [d]), " 'the court lack[s] statutory authority to sever' " (*People v Rogers*, 94 AD3d at 1248, quoting *People v Bongarzone*, 69 NY2d 892, 895 [1987]; *see People v Cherry*, 46 AD3d 1234, 1236 [2007], *lv denied* 10 NY3d 839 [2008]; *People v Kelley*, 46 AD3d at 1331).

Based upon our review of the record, we are satisfied that counts 1, 3, 5-12, 14, 20 and 26 were properly joined pursuant to, among other things, CPL 200.20 (2) (b), as the proof adduced with respect thereto was material and admissible as to defendant's motive, intent and modus operandi. Simply put, the similarities existing between the victims, the type of property damage that occurred and the materials utilized in the underlying crimes, particularly with respect to the improvised explosive devices (hereinafter IEDs), demonstrates that defendant's "modus operandi was sufficiently unique to make proof of his commission of one [crime] probative of his commission of the other[s]" (*People v Jones*, 236 AD2d at 846 [internal quotation marks and citation omitted]). We reach a similar conclusion with respect to count 2—notwithstanding County Court's finding that the underlying crime was not part and parcel of defendant's overall "scheme." As the challenged counts were properly joined under CPL 200.20 (2) (b), County Court lacked the authority to sever them from the remaining counts of the indictment (*see People v Rogers*, 94 AD3d at 1248; *People v Cherry*, 46 AD3d at 1236; *People v Kelley*, 46 AD3d at 1331). Moreover, even if we were to find that all of the subject counts were joinable solely under CPL 200.20 (2) (c), we nonetheless would conclude that County Court did not abuse its discretion in denying defendant's motion, as defendant failed to demonstrate good cause to sever those counts. Indeed, defendant's claim of prejudice in this regard is undercut by the fact that he was acquitted of counts 2, 10 and 14, thus demonstrating that the jury was able to separately consider the proof with respect to each offense (*see People v Johnson*, 79 AD3d 1264, 1265 [2010], *lv denied* 16 NY3d 832 [2011]; *People v Jones*, 236 AD2d at 846; *cf. People v Rodriguez*, 68 AD3d 1351, 1353 [2009], *lv denied* 14 NY3d 804 [2010]).

Nor do we find merit to defendant's claim that County Court erred in denying his motion to suppress certain newspaper clippings seized from his briefcase.[7] In February 2009, four search warrants were issued in this matter, including a warrant to search defendant's office and a warrant to search a certain black leather briefcase belonging to him. Although the parties continue to debate whether the briefcase warrant, which failed to specify at all—much less with the required degree of

---

7. The clippings, which defendant showed to and discussed with Keith McKenna, who was acting as a police informant, described the incident that gave rise to the charges contained in count 1 of the indictment.

particularity—the place or premises where it was expected to be found (*see* NY Const, art I, § 12; US Const Amend IV; CPL 690.05 [2] [a]; 690.45 [4], [5]; *People v Brown*, 96 NY2d 80, 84 [2001]), may be remedied by resort to the supporting affidavit executed in conjunction therewith (*see People v Carpenter*, 51 AD3d 1149, 1150 [2008], *lv denied* 11 NY3d 786 [2008]; *People v Davenport*, 231 AD2d 809, 810 [1996], *lv denied* 89 NY2d 921 [1996]), this issue need not detain us. Defense counsel conceded at oral argument—and the record indeed confirms—that the warrant authorizing the search of defendant's office was valid, and this warrant, in turn, authorized the police to search for and seize "notes of preparation or notes pertaining to any criminal acts." To our analysis, the relevant newspaper clippings, at least one of which contained highlighted passages, fall within the scope of the warrant.

As for defendant's claim that the police could not properly search his briefcase, which was located in his office, for such clippings pursuant to the separate office warrant, we do not agree.

> "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found" (*United States v Ross*, 456 US 798, 820-821 [1982]; *accord People v Powers*, 173 AD2d 886, 888 [1991], *lv denied* 78 NY2d 1079 [1991]; *see People v Brown*, 96 NY2d at 90; *People v Padilla*, 132 AD2d 578, 578 [1987]).

Applying these principles to the matter before us, the police could properly search any file cabinet, drawer, box, folder or other container in defendant's office where such papers or clippings might be found—including defendant's briefcase (*see id.*; *see also People v Allen*, 156 AD2d 700, 701 [1989]). Contrary to defendant's assertion, the validity of the office search warrant is in no way undermined by any defect in the briefcase warrant. Finally, even assuming that an irregularity exists with respect to the underlying warrant returns, the filing of the return and inventory as set forth in CPL 690.50 (5) is a ministerial act, and the failure to comply with the statutory provisions "will not

invalidate a search that was properly executed pursuant to a valid search warrant" (*People v Woodard*, 93 AD3d 944, 948 [2012] [internal quotation marks and citation omitted]; *see People v Fernandez*, 61 AD3d 891, 891 [2009], *lv denied* 13 NY3d 744 [2009]). Hence, defendant's motion to suppress was properly denied.

■ We reach a similar conclusion with respect to a particular statement made by defendant following his arrest by members of the Town of Schodack Police Department on February 24, 2009. "Not all remarks made by law enforcement personnel constitute *impermissible* interrogation" (*People v Lombardi*, 97 AD2d 278, 280 [1983] [emphasis added; citations omitted]). Here, as part of the booking process, defendant, who had not been Mirandized, was provided with a copy of the accusatory instrument, whereupon—consistent with what was described as standard departmental practice—he was asked "if he wanted [the accusatory instrument] read to him or if he wanted to read it." In response, defendant stated, "No, I know what it's about."

To our analysis, this simple administrative inquiry required nothing more than a "yes" or "no" answer. Notably, the question posed was not open-ended in nature, did not invite discussion (*compare People v Lombardi*, 97 AD2d at 279-280) and, under the circumstances presented, was neither "a disguised attempt at [an] investigatory interrogation" (*People v Callicut*, 101 AD3d 1256, 1264 [2012], *lv denied* 20 NY3d 1096 [2013]) nor an inquiry that the police "*should have known* [was] reasonably likely to elicit an incriminating response" (*Rhode Island v Innis*, 446 US 291, 302 [1980]; *see People v Rodney*, 85 NY2d 289, 294 [1995]; *People v Callicut*, 101 AD3d at 1264; *People v Franklin*, 288 AD2d 751, 752-753 [2001], *lv denied* 97 NY2d 728 [2002]; *compare People v Lombardi*, 97 AD2d at 280). The fact that the question may have produced what defendant now regards as an incriminating response is of no moment, as "the test for suppression is not whether the information [obtained was] inculpatory but whether the police were trying to inculpate defendant or merely process[ ] him" (*People v Nelson*, 147 AD2d 774, 776 [1989], *lv denied* 74 NY2d 794 [1989]; *see People v Hester*, 161 AD2d 665, 666 [1990], *lv denied* 76 NY2d 858 [1990]). Accordingly, we discern no basis upon which to suppress defendant's statement.

Defendant's asserted *Molineux* violations do not warrant extended discussion. Assuming, without deciding, that County Court erred in admitting into evidence testimony regarding an

incident at the home of Kenneth LeGere in 1993, we nonetheless would find any error in this regard to be harmless in light of the overwhelming evidence of defendant's guilt (*see generally People v White*, 41 AD3d 1036, 1038 [2007], *lv denied* 9 NY3d 965 [2007]). As for testimony regarding an altercation between defendant and James Bachus, a District employee, to the extent that defendant's argument on this point has been preserved for our review, we find it to be lacking in merit. Finally, defendant's objection to certain testimony offered by Gregory Zannitto regarding a verbal altercation that he had with defendant in 1995 is preserved for our review, and we agree with defendant that, because such testimony did nothing more than establish defendant's propensity to mistreat his employees, County Court erred in admitting it into evidence. That said, we nonetheless find such error to be harmless (*see id.* at 1038).

[■] Defendant next contends that County Court erred in admitting into evidence a report prepared by an FBI forensic chemistry examiner, who opined as to the composition of six substances—three powder samples and three samples of an epoxy-type resin containing a fuse—that were recovered from, among other places, defendant's office.[8] Specifically, defendant asserts that his right of confrontation was violated because the testifying analyst relied upon raw data compiled by another chemist working in the same lab, the latter of whom was not produced at trial. We do not agree.

To be sure, the Sixth Amendment to the United States Constitution guarantees a defendant the right to confront the witnesses against him or her (*see People v Brown*, 13 NY3d 332, 338 [2009]) and, for that reason, "surrogate testimony," i.e., the process by which "the testimonial statement of one witness . . . [is] enter[ed] into evidence through the in-court testimony of a second person" is not permitted (*Bullcoming v New Mexico*, 564 US —, —, —, 131 S Ct 2705, 2713, 2714 [2011]; *compare People v Rios*, 102 AD3d 473, 475 [2013], *lv denied* 20 NY3d 1103 [2013]). Thus, in order to avoid a *Crawford* violation (*see Crawford v Washington*, 541 US 36, 42 [2004]), "analysts who write reports that the prosecution introduces [into evidence at trial] must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa' " (*Bullcoming v New Mexico*, 564 US at —, 131 S Ct at

---

**8.** Although the analyst testified that one of the three IEDs recovered was found in defendant's residence, the record reflects that this was a clerical error and that the relevant device was in fact seized from defendant's office.

2715, quoting *Melendez-Diaz v Massachusetts*, 557 US 305, 319 n 6 [2009]).

Here, however, no surrogate testimony was adduced at defendant's trial and, therefore, no *Crawford* violation occurred. Although the analyst in question indeed based his opinion upon raw data that was generated—in part—by another chemist in the same lab, a review of the record makes clear that, among other things, the testifying analyst drew his own scientific conclusions from such data; those conclusions, in turn, were embodied in the expert report that the testifying analyst authored. Additionally, even assuming that the raw data qualifies as testimonial evidence within the meaning of *Crawford*—an issue we need not address—neither the data itself nor any conclusions reached or opinions held by the nontestifying analyst were entered into evidence at trial, and the analyst who did opine as to the composition of the substances at issue testified and was subject to cross-examination (*see People v Brown*, 13 NY3d at 340). Under these circumstances, defendant's right of confrontation was not violated simply because the People's expert "made reference to data gathered by [a] nontestifying [analyst]" (*People v Vargas*, 99 AD3d 481, 481 [2012]; *see People v Rios*, 102 AD3d at 475; *compare Bullcoming v New Mexico*, 564 US at — - —, 131 S Ct at 2713-2714; *Melendez-Diaz v Massachusetts*, 557 US at 309-311).

[7] Defendant's claim that County Court abused its discretion in admitting certain demonstrative evidence is equally unavailing. "Demonstrations and tests, when relevant to a contested issue, can play a positive and helpful role in the ascertainment of the truth" (*People v Caballero*, 34 AD3d 690, 691 [2006], *lv denied* 8 NY3d 878 [2007] [internal quotation marks and citation omitted]; *accord People v Boone*, 176 AD2d 1085, 1086 [1991], *lv denied* 79 NY2d 853 [1992]). To that end, "[i]t is for the trial court, in the exercise of its sound discretion [and] based upon the nature of [the] proof and the context in which it is offered, to determine whether the value of the [proffered] evidence outweighs its potential for prejudice" (*People v Boone*, 176 AD2d at 1086; *see People v Acevedo*, 40 NY2d 701, 704-705 [1976]; *People v Mercereau*, 84 AD3d 1270, 1271 [2011], *lv denied* 17 NY3d 819 [2011]).

Here, the demonstrative evidence consisted of an FBI video depicting six controlled explosions—three utilizing M-98s, the largest commercially manufactured consumer firecrackers that may be purchased legally (each containing 50 milligrams of

flash powder), with the remaining three utilizing IEDs similar in size, construction, chemical composition and weight to the three unexploded devices recovered here.[9] Specifically, the video depicted an M-98 and an IED each being detonated in three types of materials—a 40-pound block of ballistic gelatin, a concrete block and a mailbox—and was offered to demonstrate the explosive potential of an IED. Inasmuch as the People were required to prove—for certain of the underlying charges (*see e.g.* Penal Law §§ 150.10 [1]; 150.20 [1]; 265.04 [1])—that an explosive device was used by defendant in the commission of the crimes (*see People v Boone*, 176 AD2d at 1086), and in view of defendant's attempts to imply that the devices at issue here were nothing more than firecrackers, we cannot say that County Court abused its discretion in allowing the video to be displayed to the jury for that limited purpose. In this regard, we note that County Court gave an appropriate limiting instruction to the jury prior to viewing the video, thereby minimizing the potential prejudice to defendant (*see People v Caldavado*, 78 AD3d 962, 963 [2010], *lv denied* 16 NY3d 829 [2011]). To the extent that defendant contends that the items detonated in the video (the ballistic gelatin, the concrete block and the mailbox) were not "sufficiently similar" (*People v Estrada*, 109 AD2d 977, 978 [1985] [internal quotation marks and citation omitted]; *accord People v Jones*, 70 AD3d 1253, 1255 [2010]) to the open areas where the unexploded IEDs were recovered in this case, those differences were readily apparent to the jury, and any variation between the demonstrative video and the actual detonations at issue here affected the weight to be accorded to such evidence, not its admissibility (*see People v Gorham*, 72 AD3d 1108, 1110 [2010], *lv denied* 15 NY3d 773 [2010]).

With respect to the various crimes of which defendant ultimately was convicted, defendant argues that his conviction of arson in the first degree (under count 1 of the indictment) is not supported by legally sufficient evidence and, further, is against the weight of the evidence. In this regard, although defendant's challenge to the legal sufficiency of the evidence is not preserved for our review, "our weight of the evidence review necessarily involves an evaluation of whether all elements of

---

**9.** The IEDs detonated in the video contained 15.989 grams of flash powder (comprised of potassium perchlorate and aluminum), while the three IEDs recovered in this case contained 15.8 grams, 17.2 grams and 13 grams, respectively, of a similarly comprised flash powder (containing potassium perchlorate, aluminum and, in one instance, sulphur).

the charged crime were proven beyond a reasonable doubt at trial" (*People v Burch*, 97 AD3d 987, 989 n 2 [2012], *lv denied* 19 NY3d 1101 [2012] [internal quotation marks and citations omitted]). Insofar as is relevant here, a person is guilty of arson in the first degree when he or she intentionally damages a building by causing an explosion or fire through the use of an explosive or incendiary device while another person is present in such building, and the perpetrator knows of that person's presence "or the circumstances are such as to render the presence of such person therein a reasonable possibility" (Penal Law § 150.20 [1]).

Here, there is no question that a residence belonging to Colleen Cappitumino and Stephen Cappitumino in the Town of Rotterdam, Schenectady County was damaged by an explosive device in August 2001 and, given that a car was parked in the driveway on the morning in question and at least one light was on inside the residence, the latter of which would have been visible from the front porch where the explosion occurred, we are satisfied that those circumstances gave rise to a reasonable possibility that there were people inside the residence at the time. Hence, the only remaining question is whether the jury failed to give the evidence the proper weight in concluding that defendant was the perpetrator. Viewing the evidence in a neutral light—including the testimony of Cynthia Chevalier, Robert Denny, Harold Gray and Keith McKenna, together with statements made by defendant during a recorded conversation with McKenna in December 2008—and according due deference to the jury's credibility determinations (*see People v Jones*, 101 AD3d 1482, 1482 [2012]; *People v Weiss*, 99 AD3d 1035, 1038 [2012], *lv denied* 20 NY3d 1015 [2013]), we find that the jury's verdict is not against the weight of the evidence. Accordingly, defendant's judgment of conviction will not be disturbed.

[█] As for defendant's claim that he was denied the effective assistance of counsel, we disagree. A review of the record reveals that defense counsel engaged in appropriate motion practice, made cogent opening and closing statements, effectively cross-examined the People's numerous witnesses, presented a coherent defense and, contrary to defendant's assertion, made timely and appropriate objections. Additionally, defense counsel successfully moved to have one of the counts dismissed against defendant at the close of the People's case based upon legal insufficiency (count 25) and, further, secured an acquittal for defendant on four of the charges against him (counts 2, 4, 10

and 14)—one of which was a class A-1 felony. Accordingly, viewing the record in its totality, we are satisfied that defendant received the effective assistance of counsel (*see People v Davis*, 105 AD3d 1095, 1097-1098 [2013]; *People v Wilson*, 78 AD3d 1213, 1216-1217 [2010], *lv denied* 16 NY3d 747 [2011]; *People v Lewis*, 46 AD3d 943, 947 [2007]; *People v De Marco*, 33 AD3d 1045, 1046 [2006]).

Finally, even assuming that defendant's various hearsay objections were valid, we nonetheless would conclude that County Court's failure to sustain the relevant objections was harmless error, as "there was no significant probability that the jury would have acquitted defendant in light of the overwhelming evidence of his guilt" (*People v Ortiz*, 33 AD3d 1044, 1045 [2006]; *see People v Phillips*, 55 AD3d 1145, 1147 [2008], *lv denied* 11 NY3d 899 [2008]; *People v Lewis*, 25 AD3d 824, 826 [2006], *lv denied* 7 NY3d 791 [2006]). Defendant's remaining contentions, including his assertion that the sentence imposed is harsh and excessive, have been examined and found to be lacking in merit.

PETERS, P.J., LAHTINEN and McCARTHY, JJ., concur.

Ordered that the judgment is affirmed.