IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-423

Filed 2 April 2024

Columbus County, No. 18 CRS 50397

STATE OF NORTH CAROLINA

v.

JILL HARDIE TAYLOR

Appeal by Defendant from judgment entered 31 October 2022 by Judge James G. Bell in Columbus County Superior Court. Heard in the Court of Appeals 28 November 2023.

*Attorney General Joshua H. Stein, by Assistant Attorney General John W. Congleton, for the State.*

*Tharrington Smith, L.L.P., by Douglas E. Kingsbery and Lacy A. Hanson, for Defendant.*

WOOD, Judge.

Jill Taylor ("Defendant") was driving very slowly or was stopped in the right lane of Highway 74 when the driver of a tractor trailer swerved to avoid her vehicle, causing the tractor trailer to crash into a tree and explode, killing the driver in the ensuing fire. A jury found Defendant guilty of second-degree murder based upon driving while impaired and reckless driving. On appeal, Defendant argues that her Fourth and Sixth Amendment rights were violated and that the State introduced evidence of malice in violation of Rule of Evidence 403. After careful review of the

Record and applicable law, we hold Defendant received a fair trial free from prejudicial error.

## I. <u>Factual and Procedural History</u>

On 18 February 2018 at approximately 8:30 p.m., Defendant was driving a red sedan east along U.S. Highway 74 just outside of Whiteville. Ricky Crocker ("Crocker") was also driving east along the same portion of highway just moments behind Defendant in a tractor-trailer truck loaded with cement curbing blocks. Crocker came upon Defendant's vehicle, collided with her stopped vehicle, and died as a result of the crash and ensuing fire.

Just prior to the collision, witnesses observed Defendant's car on Highway 74. Channing Glover ("Glover") came upon Defendant and saw her vehicle in the right lane driving very slowly, approximately five to ten miles per hour, despite a posted speed limit of seventy miles per hour along that section of the highway. Glover narrowly avoided a collision with Defendant by swerving around the left-hand side of her vehicle. Jonathan Highfill ("Highfill") was also driving east along Highway 74 when he saw Defendant's vehicle suddenly and completely stopped in the road in front of him without any turn signal or emergency flashers operating. Highfill was forced to swerve around the left-hand side of Defendant's vehicle to avoid colliding into it. He too narrowly avoided a collision.

Craig Clarke ("Clarke") was traveling westbound on Highway 74 with Tony Oxford ("Oxford") when he witnessed the tractor trailer being driven by Crocker

colliding into Defendant's vehicle. He saw the tractor trailer, which was traveling approximately the speed limit, swerve towards the median and saw its trailer swing towards the shoulder. The "tail end" of the trailer swung around as the driver attempted to swerve to avoid a collision, and it "clipped" the rear left quarter panel of Defendant's vehicle, breaking the rear bumper, crumpling the trunk, and tearing off the left rear tire. According to the witnesses, Crocker did not reduce his speed before the collision. The cab of his tractor trailer hit a tree and exploded upon impact, and Crocker ultimately died in the ensuing fire.

Oxford was traveling in the car with Clarke at the time of the collision. Oxford is a retired law enforcement officer with twenty years of experience as a patrol officer, narcotics officer, and investigator. He was asleep at the time of the collision, but Clarke woke him up and told him he had just witnessed the accident and that the truck exploded. Clarke turned around in the median so that they could check on what had happened. They pulled up to the cab of the tractor trailer, which was fully engulfed in flames, and ran toward it to see if they could do anything to help. Oxford could see Crocker slumped over in the cab of the tractor trailer, and other people had already gathered at the truck to try to render aid to him.

Oxford noticed Defendant's vehicle in the ditch next to the woods and ran over to it. He saw Defendant in the driver's seat and tried to open the door. He could not open the driver's door, so he helped her crawl out of the passenger side. Immediately, Oxford smelled a distinct odor emitting from Defendant's car while helping her.

Defendant told Oxford she had to have her purse, and after retrieving it, she carried it with her and "cuddled it like a baby." Oxford asked Defendant if she was fine. She responded yes and then repeated at least a dozen times that she needed to call somebody to come get her. Oxford noticed that Defendant's speech was slow and slurred. He told her there was a man in the tractor trailer burning to death, and she once again stated she needed to go home. Defendant was stumbling as Oxford helped her over to his truck. He allowed her to sit in the front passenger seat of his truck, and he noted she had very distinct signs of dilated pupils, was lethargic, and occasionally nodded off and woke up again. He asked her a few times if she was hurt. She never mentioned any type of injury but continually asked to be taken home. Oxford left the truck for approximately fifteen minutes to check on the progress of those attempting to render aid to Crocker in the tractor trailer. When he returned to his truck, he noticed the same odor in his truck that was in Defendant's vehicle.

When a trooper checked on Defendant, Oxford told him that something was not right with her actions. He reported she was lethargic and had a lack of concern for everything going on. Oxford believed Defendant was impaired on a drug, although he smelled no alcohol or marijuana. Emergency medical technicians ("EMTs") arrived about an hour later, and Oxford told them she had no observable injuries but that he believed she was impaired due to drugs.

Three different EMTs evaluated Defendant. Caitlyn Soles ("Soles") was the first medical personnel to examine Defendant, who was still in the passenger seat of

the truck. Soles noted Defendant had "dazed off" and was securing her purse to her chest like she did not want it to go anywhere. Defendant told Soles she could not remember what happened except that a truck hit her. Soles asked Defendant if she wanted to go to the hospital, and she said no. Soles walked Defendant to the ambulance, where Defendant stated she did not want her vital signs checked. Soles observed Defendant place her head into her purse two or three times and lift her head back up. While discussing what she should do with her medic, Reggie Morrison ("Morrison"), they made eye contact and indicated a mutual understanding that Defendant was doing drugs. Morrison noted Defendant's eyes were dilated and that she acted drowsy and confused whenever she lifted up her head from her purse. He believed Defendant was possibly impaired based on her behavior, drowsiness, and confusion as to her surroundings. Defendant was adamant with Morrison that she was not going to be transported to the hospital, despite his advice.

Cherie Register ("Register"), another EMT, approached Defendant while she was still in the passenger seat of the truck and observed Defendant holding a purse and what looked like a hairspray can or some other type of aerosol can that she would hold up to her face. Register asked Defendant if she was the one driving the vehicle that got hit and if she was okay. Register noted that Defendant was sluggish-acting, slow to respond, and had "constricted" pupils, and she believed Defendant was under the influence of drugs or alcohol. She did not observe Defendant having any injuries. Register was startled by Defendant's complete lack of emotion considering everything

going on around them. When Register told Defendant that Crocker did not make it out of the tractor trailer, she just said, "okay." Later, after Register helped remove Crocker's body from the cab of the tractor trailer, she went to the ambulance where Defendant was. Register observed that she would stick her nose into her purse and saw the same aerosol can in it that she was holding earlier.

N.C. Highway Patrol Officer G.S. Hooks ("Trooper Hooks") was the first State Trooper to arrive at the scene. As lead investigator in the case, he was responsible for collecting information from other State Troopers conducting the collision investigation. He interacted with Defendant for approximately fifteen minutes in total that night and did not form an opinion as to whether Defendant was impaired. Before Trooper Hooks approached Defendant, Register told him Defendant seemed to be impaired. As Trooper Hooks introduced himself to Defendant and asked her what happened in the collision, he observed that she was slow to speak and slow in her movements, such as when she slowly retrieved her license from her wallet.

When N.C. Highway Patrol Officer Victor Lee ("Trooper Lee") arrived at the scene, he observed Defendant in the ambulance placing her head into her purse like she was speaking into it. Trooper Lee asked Defendant how she was doing and what happened, and as she responded, he observed that she was lethargic and slow as though she did not have her wits about her. Trooper Lee looked through Defendant's purse and saw two aerosol cans of Dust-Off. He formed an opinion that Defendant's mental and/or physical faculties were appreciably impaired, probably due to inhaling

the Dust-Off, causing him to decide to take her to the hospital to have her blood tested. He did not place Defendant under arrest but did handcuff her before driving her to the hospital in the passenger seat of his patrol vehicle. When they arrived, they remained seated in the vehicle, and Trooper Lee read to Defendant her implied consent rights and provided her with a written copy. Defendant consented to a blood draw. A hospital phlebotomist drew her blood and gave a sample of Defendant's blood to Trooper Lee, which he preserved in a safe until it could be transported to a lab for analysis. He then took Defendant outside the hospital and left her with Trooper Hooks, who told her she was free to go. Trooper Lee did not believe he could arrest Defendant that evening because they did not have enough information as the investigation was ongoing, and he wanted to confer with the district attorney before charging her.

On 11 April 2018, a grand jury indicted Defendant for second-degree murder under N.C. Gen. Stat. § 14-17(b). Defendant's case was tried before a jury at the 10 October 2022 session of Columbus County Superior Court. At trial, N.C. Highway Patrol Officer Jim Ballard ("Trooper Ballard") was tendered as an expert witness in drug recognition. Trooper Ballard testified that based on his review of the facts of the case, including Defendant having stopped her vehicle in the highway for no apparent reason, her lack of emotion despite Crocker's death, the odor in her vehicle being the same as what Oxford smelled in his truck, and the Dust-Off aerosol cans found in her purse, he formed an opinion that Defendant's mental and physical

faculties were appreciably impaired due to central nervous system depressants and inhalants. N.C. Highway Patrol Officer J.H. Dixon ("Trooper Dixon") was tendered as an expert in collision reconstruction and crash investigation. He testified he formed an opinion that the collision occurred because Defendant was driving too slowly or was stopped in the right lane. He determined that Defendant violated several traffic statutes, namely reckless driving, going slower than forty-five miles per hour on a highway, and stopping or parking on a highway. Trooper Dixon further determined Crocker also violated a traffic statute by failing to reduce speed to avoid a collision.

On 31 October 2022, the jury convicted Defendant of second-degree murder based on theories that Defendant was driving while impaired and reckless driving, causing Crocker's death. The same day, the trial court sentenced Defendant to an active term of imprisonment of 120-156 months. On 2 November 2022, Defendant timely filed written notice of appeal pursuant to N.C. Gen. Stat. § 15A-1444. All other relevant facts are provided as necessary in our analysis.

## II. <u>Analysis</u>

### A. Defendant's Blood Sample

Defendant argues her blood sample was seized in violation of the Fourth Amendment of the U.S. Constitution and that the trial court committed plain error in admitting the blood test results. Defendant filed a pretrial motion seeking suppression of the blood test results due to alleged violations of N.C. Gen. Stat. § 20-

16.2, pertaining to drivers' implied consent to chemical analysis. On 13 October 2022, the trial court denied the motion because it concluded law enforcement committed no violations of N.C. Gen. Stat. § 20-16.2. Defendant concedes she did not object to the admission of the blood test results on constitutional grounds at trial. We must, therefore, determine whether Defendant has preserved this issue for our review.

N.C. R. App. P. 10(a)(4) provides, "an issue that was not preserved by objection noted at trial . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." However, "constitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal." *State v. Davis*, 364 N.C. 297, 301, 698 S.E.2d 65, 67 (2010) (brackets omitted). In *Davis*, the trial court sentenced the defendant to terms of imprisonment for felony death by vehicle and felony serious injury by vehicle as well as second-degree murder and assault with a deadly weapon inflicting serious injury. *Id.* at 300, 698 S.E.2d at 67. The defendant did not object at the sentencing hearing. *Id.* On appeal before this Court, Defendant challenged his sentences, alleging unconstitutional violations of double jeopardy principles and of N.C. Gen. Stat. § 20-141.4(b) which, he argued, did not authorize both pairs of sentences. *Id.* This Court did not address the merits of the defendant's arguments because he did not preserve his objection to a purported double jeopardy violation at trial. *Id.* at 301, 698 S.E.2d at 67. The defendant appealed to our Supreme Court, which upheld this Court's dismissal of his double jeopardy claims but held that this

Court erred in dismissing his statutory argument. *Id.* Thus, our Supreme Court differentiated between the preservation of a constitutional issue and a statutory issue on appeal.

We conclude that *Davis* is applicable to this case. Here, at trial, Defendant sought to suppress her blood test results solely on the basis of purported violations of N.C. Gen. Stat. § 20-16.2, but she does not renew that argument on appeal. Thus, we do not address her statutory argument. Because Defendant did not object at trial to admission of her blood test results on the basis of a purported Fourth Amendment violation, we hold she waived the argument. Therefore, we decline to address Defendant's constitutional argument here.

## B. The Blood Analysis Report

Defendant next argues the trial court erred in admitting the laboratory ("lab") report prepared and signed by Curtis Reinbold ("Reinbold"), a forensic scientist at the N.C. state crime lab in Raleigh, because he did not testify in violation of her Sixth Amendment right to confront witnesses against her. Specifically, Defendant argues that because Reinbold did not testify, it was impossible for her to cross-examine him on subjects such as chain of custody of the blood sample and the reliability of his methods and results.

First, we determine whether Defendant preserved this purported constitutional error for review. We previously have noted that a constitutional objection must be raised before the trial court. *Davis*, 364 N.C. at 301, 698 S.E.2d at

67. Here, there were two lab reports admitted into evidence. State's Exhibit 24, a lab report prepared by Cierra Bell, a forensic scientist at the N.C. state crime lab, confirmed the presence of Difluoroethane, a highly impairing substance used in Dust-Off, in Defendant's blood. State's Exhibit 25, a lab report prepared by Reinbold, confirmed the presence of Alprazolam (commonly known as Xanax, which has the impairing effects of drowsiness and confusion), Amitriptyline, Bupropion, and Chlorcyclizine in Defendant's blood. When the State offered the exhibits as evidence, the trial court asked if Defendant had any objection, to which her counsel replied, "Yes, sir, Judge. Renew my objection under Sixth Amendment." The trial court noted the objection for the record and admitted the exhibits into evidence. Therefore, Defendant objected based on Sixth Amendment grounds at trial. Accordingly, this constitutional issue is preserved, and we will address the merits of her argument.

"We review an alleged violation of a defendant's constitutional right to confrontation *de novo.*" *State v. Joyner*, 284 N.C. App. 681, 686, 877 S.E.2d 73, 79 (2022).

It is fundamental that the Sixth Amendment to the U.S. Constitution provides a defendant in "all criminal prosecutions" the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI (the "Confrontation Clause"). In a landmark Confrontation Clause case, *Crawford v. Washington*, the U.S. Supreme Court held that testimonial statements of a witness who is absent from trial may be admitted only if the declarant is unavailable and the defendant had a prior

opportunity to cross-examine the declarant. 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L.Ed.2d 177, 197 (2004).

Confrontation Clause issues may arise in the application of the rules of evidence pertaining to expert witnesses. "The North Carolina Rules of Evidence allow for expert testimony 'in the form of an opinion, or otherwise,' if the expert's 'scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue,' provided" that the witness is properly tendered as an expert in accordance with the rules of evidence. *State v. Ortiz-Zape*, 367 N.C. 1, 5, 743 S.E.2d 156, 159 (2013) (quoting N.C. R. Evid. 702(a)). An expert's opinion may be based on "facts or data . . . perceived by or made known to him at or before the hearing." N.C. R. Evid. 703. Significantly, if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, [they] need not be admissible in evidence." *Id.*

In *Ortiz-Zape*, our Supreme Court considered whether the Confrontation Clause was violated when a witness tendered as an expert in forensic science testified as to her opinion that a substance was cocaine based upon her independent analysis of testing performed by another analyst in her lab. 367 N.C. at 2, 743 S.E.2d at 157. In *Ortiz-Zape,* the court analyzed a U.S. Supreme Court case, *Bullcoming v. New Mexico*, which posed a similar question—whether a forensic lab report could be introduced for substantive purposes through the "testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." 367

N.C. at 7, 743 S.E.2d at 160 (quoting *Bullcoming*, 564 U.S. 647, 652, 131 S. Ct. 2705, 2710, 180 L. Ed. 610, 616 (2011)). The court in *Bullcoming* held "that surrogate testimony of that order does not meet the constitutional requirement." *Bullcoming*, 564 U.S. at 652, 131 S. Ct. at 2710, 180 L. Ed. at 616. The court in *Ortiz-Zape* specifically noted that Justice Sotomayor, in her concurring opinion in *Bullcoming*, clarified that the case was *not* one in which the in-court witness was a "supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." 367 N.C. at 7, 743 S.E.2d at 160 (quoting *Bullcoming*, 564 U.S. at 672, 131 S. Ct. at 2722, 180 L. Ed. at 629 (Sotomayor, J., concurring in part)).

Ultimately, the court concluded in *Ortiz-Zape* that "when an expert states her own opinion, without merely repeating out-of-court statements, the expert is the person whom the defendant has the right to cross-examine." 367 N.C. at 8, 743 S.E.2d at 161. The court found that conclusion is consistent with its holding in *State v. Fair* that "[i]t is the expert opinion itself, not its underlying factual basis, that constitutes substantive evidence." 354 N.C. 131, 161–62, 557 S.E.2d 500, 521–22 (2001) (no Confrontation Clause violation where the in-court expert did not conduct the blood test herself but was able to determine the location on the victim's pants from which the DNA sample had been taken, an important foundation issue in the case). Therefore, the court in *Ortiz-Zape* specifically held that "[i]n such cases, the Confrontation Clause is satisfied if the defendant has the opportunity to fully cross-examine the expert witness who testifies against him, allowing the factfinder to

understand the basis for the expert's opinion and to determine whether that opinion should be found credible." 367 N.C. at 9, 743 S.E.2d at 161 (quotation marks omitted).

Here, this case is not one in which the expert witness testifying in court did not personally participate in the testing. Megan Keeler ("Keeler"), a forensic scientist at the N.C. state crime lab and also the State's expert witness, testified regarding State's Exhibit 25 that she "look[ed] at the raw data that was generated from the initial analysis by a coworker, and . . . review[ed] it like [she] would if [she] were the original viewer." Keeler explained:

> So there is an author of the report, which would be the analyst that samples and does the test, the process, and then there will be another analyst that's a peer reviewer, like I just spoke. They will check all of the paperwork and documentation and make sure that everything is in order, and then they will release the case if they agree. So two analysts have to agree with the results. The second analyst will be the reviewer and the final one to view the case and say it's good or it's not good, there is some things we need to review. And so I am trained as a reviewer and as an analyst. I will review the data just like I was the reviewer, and so I'm actually, like, looking at it as a third person in this case.

Keeler testified regarding lab protocols, "every test is done the same, providing [a] standardized result." She also testified that she "did some of the data processing in the drug case" and "performed the initial drug screening for the drug record," which means she prepared the blood sample for testing by conducting an "ELISA" analysis (enzyme-linked immunosorbent assay). She specified that Reinbold "wrote the report and made an opinion that I agreed with." Finally, Keeler testified there was an

"issue" during the test with the barbiturate assay that required repeating the analysis which they successfully completed, thereby assuring correct data as a result. Specifically, she was the "coordinator" of the instrument, which meant that she assisted Reinbold in correcting the errant instrument by testing it, ensuring it was back in proper working order, and certifying it back into use.

Accordingly, Keeler did not merely repeat out-of-court statements. *Ortiz-Zape*, 367 N.C. at 8, 743 S.E.2d at 161. Although she did not sign the certification, she participated in preparing the blood sample for testing, was trained as a reviewer, reviewed the underlying data, and formed her own independent opinion as to the test results. *See Ortiz-Zape*, 367 N.C. at 7, 743 S.E.2d at 160; *Bullcoming*, 564 U.S. at 672, 131 S. Ct. at 2722, 180 L. Ed. at 629. As an expert with personal knowledge of the processes involved and personal participation in the testing, she was the witness whom Defendant had a right to cross-examine, and she was indeed subject to cross-examination at trial. Therefore, we hold that Defendant's constitutional right to confrontation was not violated in this case. Defendant argues that Reinbold's absence at trial leaves the lab report without adequate foundation because she could not cross-examine him regarding the blood sample's chain of custody. However, she neither attempted to cross-examine Keeler on this issue, nor objected for insufficient foundation based on a lack of chain of custody testimony. Thus, the trial court did not err in admitting State's Exhibit 25 into evidence.

**C. Rule 404(b) Evidence**

Finally, Defendant argues the trial court erred in admitting evidence under Rule 404(b) of other crimes, wrongs, or acts, all involving suspected or actual charges of driving while under the influence, because such evidence failed the Rule 403 balancing test.

Our Supreme Court has specified the distinct standards of review when analyzing rulings applying Rule 404(b) and Rule 403:

> [W]e conduct distinct inquiries with different standards of review. When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, . . . we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion.

*State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).

Rule 404(b) permits "[e]vidence of other crimes, wrongs or acts . . . . for purposes" other than proving a defendant acted in conformity with a given character trait, including "knowledge." N.C. R. Evid. 404(b). Although "Rule 404(b) is a clear general rule of *inclusion*[, it] . . . . is still constrained by the requirements of similarity and temporal proximity." *Beckelheimer*, 366 N.C. at 130–31, 726 S.E.2d at 159 (quotation marks omitted) (emphasis in original). Rule 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or needless presentation of cumulative evidence." N.C. R. Evid. 403.

Here, Defendant made a pretrial motion seeking to prohibit or limit evidence of prior acts the State intended to introduce under Rule 404(b), arguing that their probative value was substantially outweighed by the danger of unfair prejudice because the jury inevitably would view such evidence as propensity evidence, a risk that a limiting instruction would not resolve. The trial court orally denied the motion, stating it would "allow each of the DWI charges and other incidents of accidents and bad driving to be used by the [S]tate." On 13 October 2022, the trial court entered its written order in which it found that for each of the five prior acts:

> [T]here is sufficient evidence that the Defendant committed those acts, that the evidence is admitted for the proper purpose of malice, that the evidence is sufficiently similar and close in time and that upon conducting the Rule 403 balancing test, the probative value outweighs the prejudice to the Defendant and the Court finds that the evidence is admissible under Rule 404(b).

Defendant does not argue the trial court's findings are unsupported by the evidence, and we conclude sufficient evidence supported the trial court's written findings closely and accurately detailing the testimony regarding each of the five incidents. We further conclude the findings support the trial court's conclusion that the prior acts are sufficiently similar and close in time. As for similarity, all five prior acts involved suspected driving while under the influence. Four of the five incidents

resulted in Defendant actually being charged for DWI.[1]  Three of the five incidents specifically involved Dust-Off aerosol cans.  It is hard to imagine evidence more probative of the required showing of malice for second-degree murder which is Defendant's deliberate disregard for human life as evidenced by her repeated instances of driving while impaired.  *See* N.C. Gen. Stat. § 14-17(b).  As for timing, the incidents occurred between 30 September 2017 and 18 February 2018.  Defendant accrued these charges in a span of less than half a year, indicating that driving while impaired was not a one-time incident that occurred in the distant past and therefore not probative of Defendant's state of mind.  Accordingly, we hold the trial court's findings supported its conclusions as to its Rule 404(b) ruling.

Finally, we hold the trial court did not abuse its discretion in its Rule 403 ruling.  As noted, each of the five incidents were particularly probative of malice, an element the State must prove for a second-degree murder charge.  Rule 404(b) specifically contemplates *including* evidence to show knowledge, which here includes Defendant's knowledge that inhaling impairing substances and driving a vehicle is inherently dangerous, showing utter disregard for human life.  None of the prior incidents related to any particularly shocking or emotional facts that would have inflamed the jurors to return a guilty verdict against Defendant based on passion;

---

[1] In one incident, an officer arrived at the scene of a Domino's after responding to a call that a woman was passed out in a vehicle.  The officer tried to pull Defendant over, and although she was not driving very fast, she ran three stop signs, and he ultimately decided to abandon the pursuit.

rather, they were regular traffic incidents and DWI investigations. Accordingly, the trial court did not abuse its discretion in denying Defendant's motion based on Rule 403.

### III. **Conclusion**

Because Defendant's pretrial motion did not raise any constitutional challenges and because she failed to preserve her Fourth Amendment challenge for appellate review by entering a timely objection at trial, we decline to review it now. We hold the trial court did not violate Defendant's Sixth Amendment confrontation right by admitting a blood analysis report where the testifying expert witness participated in the lab work and was available for cross-examination. We further hold the trial court did not err in its Rule 404(b) and Rule 403 rulings denying Defendant's objection to evidence of prior acts that demonstrated malice. Defendant received a fair trial free from prejudicial error.

NO ERROR.

Judge COLLINS and CARPENTER concur.